75 N.J. Super. 192 (1962)
182 A.2d 582
SILVIA TOMAIUOLI, EXECUTOR OF THE ESTATE OF FRANK TOMAIUOLI, DECEASED, AND SILVIA TOMAIUOLI, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY, A CORPORATION DOING BUSINESS IN THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 21, 1962.
Decided June 22, 1962.
*194 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Rudolph Markowitz argued the cause for appellant (Mr. Fred Feinberg, of counsel).
Mr. Gerald F. O'Mara argued the cause for respondent (Messrs. O'Mara, Schumann, Davis & Lynch, attorneys).
The opinion of the court was delivered by FOLEY, J.A.D.
Plaintiff appeals from a judgment non obstante veredicto entered pursuant to R.R. 4:51-2, on the ground that plaintiff's proofs failed to establish a claim for relief as a matter of law.
The action was brought to recover the proceeds of an accident insurance policy issued by defendant to plaintiff's deceased husband. The policy contained a death benefit of $10,000, for which an annual premium of $31 was paid, and insured the deceased:
"against loss resulting directly and independently of all other causes from accidental bodily injuries sustained during the term of this policy (herein called `such injuries'), as follows:

* * *

*195 LOSS OF LIFE
Coverage 3. * * * if such injuries within ninety days from the date of accident shall result in the death of the Insured, the Company will pay the principal sum as hereinbefore specified.

* * *

EXCEPTIONS
This policy does not cover any accident or loss caused or contributed to by * * *
(3) disease, or medical or surgical treatment therefor, or bacterial infections (except pus-forming infections occurring through an accidental cut or wound). * * *" (Emphasis added)
On April 17, 1958 decedent, while driving his automobile, was involved in a minor traffic accident with a car driven by one Albert W. Tallaksen. He suffered no physical bodily injuries as a result thereof. Immediately after the occurrence the parties commenced exchanging licenses and other pertinent information. Meanwhile, Tallaksen's father, Herbert Tallaksen, who had been following his son in another automobile, and Thomas R. Bruce, a passerby, joined the parties. When decedent declined to furnish the name of his insurer, Herbert Tallaksen told Albert to telephone the police. Albert proceeded to a nearby restaurant to comply with his father's instructions. Bruce testified:
"[W]hen they were exchanging licenses he [decedent] seemed to be all right, he was calm and everything, and everything was going all right. But the minute Mr. Tallaksen asked him for the insurance company he started getting worked up.

* * *
[H]e started to get sort of nervous, excited like."
This witness said also that after Albert Tallaksen entered the restaurant to make the telephone call decedent "took out his wallet and he showed this Mr. [Herbert] Tallaksen the insurance company. * * * And he [Herbert] called the son out of the restaurant." By this time decedent and Herbert Tallaksen had walked to the sidewalk. Bruce continued:
*196 "And then after that was over Mr. Tomaiuoli was shaking, and he stepped from the curb, he took one step off the curb, and then for no reason at all he turned around to go back, but he only took another step and he fell forward.
* * * Well, he fell forward  he had his glasses on, he had his wallet in his hand  and he struck this building where the restaurant was about 18 inches or so above the ground.

* * *
So his glasses broke, and then he laid face down on the sidewalk, and his arm was outstretched with his wallet in it, and the blood was forming under his nose, under his head, and it was coming out."
Herbert Tallaksen's account of this sequence of events was substantially the same as that given by Bruce.
Decedent, then 72 years of age, was dead when the ambulance arrived. The death certificate signed by Doctor Noah Meyerson gave "Arterioclerotic [sic] heart disease" as the cause of death. No autopsy was performed.
The sole issue in the case, as defined in the pretrial order and restated by the trial court in its charge to the jury, was:
"Did the policy involved cover loss of decedent's life under the facts and circumstances involved?"
Before proceeding further we deem it highly important to point out that when, in the course of the trial, the attorney for plaintiff was asked to specify "which accident" he relied upon as the cause of death (reference presumably being made to the automobile collision and to decedent's fall), the attorney said that he relied "strictly" on the automobile accident, "it is the only accident I am using." (Emphasis added.) The case proceeded to judgment on this theory of accident and is now argued before us on the same theory.
To establish her claim, plaintiff relied largely upon the testimony of Doctor Alfred Yager, an internist. Decedent had been Doctor Yager's patient for approximately three years prior to his death. Originally, he had come under the doctor's care at the instance of decedent's brother Dr. *197 Tomaiuoli, a surgeon, who had detected sugar in decedent's urine. Then, or shortly thereafter, decedent developed some difficulty in urination and was referred to a urologist, who examined him cystoscopically. This procedure was complicated by fever, referable to an infection which resulted from the instrumentation, and led to the patient's hospitalization. Doctor Yager made daily checkups of decedent during the hospital confinement and found that although his heart "was no problem at the time of this hospitalization," the man had "arteriosclerotic heart disease." Thereafter, decedent called at Doctor Yager's office for routine checkups about once every three months. The doctor noted no significant changes in the arteriosclerotic heart disease, nor in a condition of diabetes from which decedent was also suffering, but he gave him routine precautionary instructions relating to his limiting the physical effort involved in operating an automobile and climbing steps, appropriate to the activities of a man of decedent's age who has diabetes and arteriosclerotic heart disease.
On direct examination the doctor was presented a hypothesis which fairly set forth the facts recited above, and then:
"Q. Now, Doctor, the automobile accident and its events and effects acting upon an imperfect state of health, would that have been the proximate cause of death?
A. I would have to say there is a strong probability that would be the cause of death.
Q. Doctor, did the accident bring about the condition from which death resulted, taking into consideration that the injured was previously ill or aged  I am sorry. That the insured was, that is, Mr. Tomaiuoli was previously ill or aged?
A. Would you repeat that question?
Q. Yes, I'll repeat it. Did the accident bring about the conditions from which death results, taking into consideration that Mr. Tomaiuoli was previously ill or aged?
A. I feel the accident was directly the cause.
Q. Doctor, can you state with any degree of medical certainty that death alone was caused by his infirmity?
A. I cannot say that death was caused by his infirmity. Death alone?
Q. Yes.
*198 THE COURT: Can you say that it was not?
THE WITNESS: I can say that death  that the infirmity alone without the accident, I can say that that was not the cause of death, but I cannot say 100 per cent. I can say it probably was not.
THE COURT: Continue.
Q. Now, Doctor, did his infirmity become active because of the accident, if you know?
A. Well, I would think not.

* * *
Q. The automobile accident and the events that followed, could that in fact affect Mr. Tomaiuoli's weak spot which could not resist as well as a healthy body?
A. I would say, yes.
Q. Now, Doctor, can you tell us with any degree of medical certainty as to whether or not the accident set in progress the chain of events leading directly to his death?
A. I feel with a fair amount of certainty that the accident led to the chain of events that caused his death.
MR. MARKOWITZ: You may cross examine."
Immediately thereafter on cross-examination the doctor clarified his opinion thus:
"Q. In other words, Doctor, the accident combined with his heart condition caused his death, in your opinion?
A. Yes."
And later:
"Q. * * * So it is your considered opinion that the excitement engendered by this accident caused a flare-up of this heart condition and resulted in his death?
A. I would say it caused something, but I didn't say it caused a flare-up of his heart condition.
Q. Call it what you will. It was that which was the inciting cause, was it not? The accident was the inciting cause?
A. The excitement.
Q. The excitement 
A. Caused the stress which provoked the symptoms that followed.
Q. And produced that excessive adrenalin that you testified to before, I believe?
A. Yes.
Q. Just one more question, Doctor. This arteriosclerosis you said is a metabolic process of the arteries whereby a fatty cholesterol tissue substance results in hardening of the arteries, is that right?
A. Yes.
*199 Q. And this may cause no symptoms or it might cause very severe symptoms?
A. Yes.
Q. Such severe symptoms as to result in death?
A. Yes.
Q. And could that be of sudden onslaught?
A. The death? Yes."
Additionally, defendant developed in the cross-examination of Doctor Yager, that there was encompassed in the arteriosclerotic heart syndrome a thoracic arteriosclerotic aneurysm  a dilated artery in the chest and that the doctor prescribed palliative medication for the arteriosclerosis. In this connection the doctor testified that when decedent first came under his care, his heart disease was manifested by a changing rhythm of the heart. "His heart * * * would go rapidly," and "he would drop by the office and ask me to check it. * * * After we had started the use of gitaligin in 1955 * * * we saw him less frequently than eight times [a year]."
Although no specific mention of the fact was made in the testimony, it is a matter of common knowledge that arteriosclerosis and its attendant symptoms are the invariable consequences of the aging process and are progressive in varying degrees depending upon the arterial fortitude of the individual.
Thus analyzed, the totality of the medical evidence, viewed most favorably to plaintiff, revealed that the automobile accident and the discussion which followed it, were the precipitating cause of exciting the decedent to a degree greater than he was able to withstand physically by reason of the underlying systemic maladies with which he was afflicted, with the consequence that he collapsed, and fell against the building suffering bodily injury, all of which in inseparable combination resulted in his demise. Hence, the question arose: Did decedent's death result directly and independently of all other causes from accidental bodily injuries in light of the circumstances described?
*200 At the conclusion of the entire case the trial court reserved decision on defendant's motion for a judgment of involuntary dismissal and submitted the question to the jury. The jury returned a verdict in favor of the plaintiff in the amount of $10,000. Thereupon, the defendant moved for a judgment n.o.v. on the reserved motion for involuntary dismissal, and also for a new trial upon the ground that the verdict was contrary to the weight of the evidence. The trial court, in granting the first branch of the defendant's motion, of course found it unnecessary to pass upon the alternative branch.
Since the motion for judgment n.o.v. is in reality a renewal of a motion made at the trial, on which the court has reserved decision, it is subject to the same rules of judicial approach as pertain to the latter. The trial court in considering such a motion cannot weigh the evidence but must accept as true all evidence which supports the view of the party against whom it is made and must give him the benefit of all legitimate inferences which are to be drawn therefrom in his favor. Melone v. Jersey Central Power & Light Co., 18 N.J. 163, 170 (1955). Yet, it is recognized that a motion for judgment made at the close of the trial should be granted where the judge by the application of the reasoning processes of the mind to the evidence adduced in the case, may properly conclude that fair-minded men cannot honestly differ as to the conclusions to be drawn from the proofs. Kopec v. Kakowski, 34 N.J. 243, 244 (1961).
Generally speaking, insurance policies are to be strictly construed against the insurer, with the court being bound to protect the insured to the full extent that any fair interpretation of the policy will allow, and to interpret the policy as sustaining coverage where the language will support two meanings, one favorable to the insurer and the other favorable to the insured. Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7 (1961); Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475 (1961).
*201 Again, as a general rule, and aside from the question of ambiguity, accident insurance policies are afforded a liberal construction in favor of coverage. Dittmar v. Continental Cas. Co., 29 N.J. 532, 542 (1959). We deem "liberal construction" to be a generic term. When applied to a purely private undertaking such as this, it is designed to so interpret the provisions of the policy as to effectuate the reasonable expectations, coverage-wise, of the member of the public who purchases it. Cf. Kievit, supra, 34 N.J., at p. 488. On the other hand, the liberality of construction achieves greater sweep where an insurance policy affects the public interest or subserves a legislative objective, as, for example, the omnibus clause of an automobile liability policy, or a financial responsibility endorsement contained therein. In such circumstances, whenever possible, the policy is so construed as to serve the public interest or to fulfill the legislative purposes. Cf. Matits v. Nationwide Mutual Ins. Co., 33 N.J. 488 (1960).
Yet, the courts will not make a different contract from that which the parties themselves have made, and so when the terms of an insurance contract are clear it is the function of the court to enforce it as written. Kampf v. Franklin Life Insurance Co., 33 N.J. 36, 43 (1960); American Mercury Ins. Co. v. Bifulco, 74 N.J. Super. 191, 195 (App. Div. 1962).
In this case we are concerned only with (1) whether ambiguity appears in the terms of the policy, and (2) whether by liberal construction of the policy as written, the death may be brought within the ambit of coverage upon the basis of any fair interpretation.
The nub of the contract is the insuring agreement. A clause providing death benefits prominently appears on the face of the policy under a caption, boldly printed, "LOSS OF LIFE." As we have already noted, it specifies that benefits will be paid for accidental injuries resulting in death only if such loss resulted "directly and independently of all other causes." In our view this statement is so clear and *202 succinct as to admit of no claim of ambiguity, in the circumstances of this case. Our problem, therefore, is narrowed to a determination of whether, on the proof submitted, the death was within the plainly stated coverage in light of prior adjudications dealing with this subject.
The trial court based its ruling on the case of Runyon v. Commonwealth Casualty Co., 109 N.J.L. 238 (E. & A. 1932). There plaintiff, while walking along an icy pavement, slipped on the ice and fell, fracturing his hip. He was taken to a hospital where he remained for several days and then he was taken to his home. He died one month and seven days after the accident. At the time of his death he was about 65 years old. For a number of years prior to the accident he had suffered from a disease known as paralysis agitans. The insurance company raised as a defense a policy provision generically the same as that here involved, and argued that the disease contributed to the death, hence there was no coverage. Plaintiff's doctor signed a death certificate in which he stated that the cause of death was as follows: "Fractured left hip from slipping on ice; duration, one month, seven days; contributory, paralysis agitans; duration, eleven years." The doctor testified at the trial that although the paralysis did not aggravate the injuries, the injury necessarily aggravated the disease by lessening the resistance of the body which had already been weakened by the disease. In other words, it aggravated the result of the disease. In response to the question of whether the paralysis and the injury worked in conjunction with each other and tended to cause the death, the witness replied, "Yes, I think I can say it would." Upon this basis the court, through Chief Justice Gummere, concluded that the death "was caused to some extent by the bodily disease or infirmity" and, therefore, was not within the policy coverage.
Assuming, but not deciding, that the excitement of decedent herein was engendered by the automobile accident and may be considered to be a "bodily injury" by liberal construction of the insurance policy, and thus may be equated *203 to the hip fracture suffered by the decedent in Runyon, we are unable to find logical reason for distinguishing this case from Runyon, factually or legally. In both cases the insured persons were, and had been, suffering from active diseases, progressive in nature, capable of producing fatality, and presenting symptoms which brought home to the victims and their respective doctors knowledge of their existence. Moreover, in both cases the treating physicians confessed inability to separate the effects of the bodily injury from the effects of the pre-existing active disease, and felt obliged to conclude that the total of such effects in combination produced the death. We, therefore, find it necessary to adopt the reasoning in Runyon and, in light of the similarity in facts, the interpretation of the insuring clause therein enunciated.
Appellant urges that the holding in Kievit, supra, should be held controlling. We think not, for the very reasons assigned by that court in distinguishing Kievit from Runyon. In this connection the court said:
"We are not here concerned with and therefore need not pass upon a situation such as that presented in Runyon v. Monarch Accident Ins. Co., 108 N.J.L. 489 (E. & A. 1932) and Runyon v. Commonwealth Casualty Co., 109 N.J.L. 238 (E. & A. 1932), where a patent, active disease was found to have contributed with the accident to the resulting death of the insured. We are here concerned with a latent, inactive condition or disease which was not accompanied by any symptoms and which was precipitated or activated by the accident into a resulting disability; * * *." 34 N.J., at p. 483. (Emphasis added)
In view of the testimony in this case we perceive no reasonable basis for describing the diseases from which decedent was suffering as "latent" or "inactive" and unaccompanied by any "symptoms." Quite the opposite is the fact.
Nor can we agree that Mahon v. American Cas. Co. of Reading, 65 N.J. Super. 148 (App. Div. 1961), certif. denied 34 N.J. 472 (1961), is factually apposite to the case sub judice. In Mahon the court held that on the *204 facts of the case a jury question was presented as to whether the loss suffered resulted from an accidental injury sustained by the assured which was the "proximate," in the sense of "predominant," cause of the loss, rather than from a congenital malformation of the brain, previously undetected and presenting no symptoms of neurological pathology. As later noted in Kievit, supra, 34 N.J., at p. 487, the testimony in Mahon was susceptible of a finding that as a direct result of the accident a "dormant, quiescent abnormality" was transformed into a "debilitating, incapacitating bodily condition," and that the pre-existing abnormality was "only a condition, not a `cause.'" 65 N.J. Super., at p. 177.
We think that here, as distinguished from Mahon, it would be wholly unreasonable to view the excitement accompanying the discussion which followed a minor traffic incident, as a bodily injury which was the predominant cause of what followed, when considered in conjunction with decedent's chronic illness.
Nor can we agree, as plaintiff argues, that Kennedy v. U.S. Fidelity, etc., Co., 113 N.J.L. 431 (E. & A. 1934), has bearing on the present problem. In Kennedy the decedent underwent substantial physical and emotional strain while driving a fire apparatus to a fire. Upon his return to the firehouse he stepped down from his truck, asked for a cigarette, and without more, dropped unconscious to the floor. He never revived. Against the contention of the defendant's medical witnesses that death was due to a diseased heart condition, as contrasted with accidental bodily injury, plaintiff offered medical proof from which it could be inferred that death was due to acute dilatation of the heart; that the dilatation was not a pathological condition but was the physiological effect of the strain upon a man who was not suffering from heart disease; and thus in a proper sense the dilatation was a bodily injury. Hence, said the court, a jury question was presented as to which of the contending medical theories should be accepted. The *205 distinctions between Kennedy and the present case are obvious. Foremost among them is that in Kennedy the proof permitted the conclusion that the victim was not afflicted by any physical ailment, heart disease included, and so the dilatation accidently induced was the sole cause of death.
While Kievit and Mahon stand strongly for liberality of construction, they serve also to point up the distinction in judicial purview between an active, patent progressive disease which in its very nature is competent to contribute to death, and a latent or dormant, symptom-free condition, possibly aggravated or exacerbated by bodily injury.
Thus, in each case where a recovery is sought, a factual determination must be made of the category in which the underlying disease falls. This may in many instances require resolution by a jury of conflicting medical or legal testimony, or of the inferences to be drawn from uncontradicted testimony. However, where such conflict does not appear directly or inferentially, the sufficiency of plaintiff's proofs to bring him within the coverage of the policy is for the court. In this connection it must be remembered that the burden rests upon the plaintiff to prove that he comes within the policy. Where, as here, his medical proofs establish affirmatively that the active disease with which he was afflicted, and for which he was being treated, not only was competent to contribute to his death, but in the opinion of his own physician, did in fact operate in conjunction with an accidental injury to produce his demise, the court has no alternative but to take the case from the jury. To do otherwise would be to render meaningless the words by which the parties expressed their bargain and would permit the jury by its verdict to express a medical opinion which the trained physician declined to venture.
Finally, we consider the suggestion advanced by plaintiff that defendant issued the policy "with tongue in cheek, ignoring the fact that a man 70 1/2 years of age when the policy was first issued and 72 1/2 years of age on renewal *206 thereof when the decedent died, was subject to the usual aging processes," and that the defendant knew "that on a strict construction of the policy, it could be absolved of liability in spite of the fact that a substantial part of the premium was paid for such coverage."
The plain answer to this argument is that for the very reason of the assured's advanced years, the policy was intended to extend restricted coverage, such intention being highlighted by the small premium which was paid. While, as appellant observes, the insurance company took the assured's physical condition as it found it subject to all of the infirmities of old age, the assured, on the other hand, took the policy as it was written with all of the limitations of its clearly expressed coverage. Common sense dictates that no reasonable person at age 72 suffering from arteriosclerotic heart disease complicated by an aneurysm and diabetes would expect to be found insurable for life insurance purposes, and that if under any circumstances he was able to obtain for $31 a year an insurance policy which contained a death benefit of $10,000, he would know that the benefit would be limited to a coverage area of extremely small compass. Compare the circumstances of the age and condition of good health of the insured at the original writing of the policy, and the lengthy duration of the agreement prior to the accident, adverted to in Kievit, supra, 34 N.J., at p. 489.
Yet, the scope of coverage here was not so limited that a court should say that decedent received little or nothing for his money. There are many situations which would have required payment of the benefit by the company notwithstanding the assured's physical infirmities; for example, a suddenly fatal airplane, highway, rail, steamship, or household accident, in which other persons lost their lives or were severely injured, or an accident not immediately fatal but involving the inflicting of bodily injuries on the assured from which he would probably have died, even if prior thereto he had been in a perfect state of health. It was *207 with a view to such occurrences, or the like, that the parties bargained.
Liberality in the construction of an agreement against the drafter when ambiguity appears, or when strict construction would contravene public policy, is a salutary principle. But it should not be used as excuse to read into a private agreement that which is not there, and that which people dealing fairly with one another could not have intended. So employed, it debases the law.
Affirmed.