LOUISE YURT SKILLMAN v.
PHOENIX MUTUAL LIFE INSURANCE COMPANY, a Corporation
AND
LOUISE YURT SKILLMAN v.
ACACIA MUTUAL LIFE INSURANCE COMPANY, a Corporation.

(Filed 31 October 1962.)

1. **Insurance § 34—**

In order to be entitled to recover under the usual double indemnity clause in a policy of insurance, claimant must show that death of insured resulted directly and independently of all other causes from bodily injury inflicted solely through external and accidental means, and if an existing disease or illness cooperated or contributed to the accident resulting in death, insurer is not liable under the double indemnity clause.

2. **Same—**

There is a distinct difference between "accidental death" and "death by external, accidental means"; the first describes a death which is unexpected, unusual, and unforeseen, and therefore fortuitous, the second describes a death in which the causal factor is accidental.

3. **Same—**

The evidence tended to show that insured was suffering from hypertension and that while driving his car along a straight highway he ran off the road and into the waters of a river. There was expert testimony that insured died from a coronary occlusion and not from drowning. *Held:* It was not error for the court to instruct the jury to the effect

that if the disease was the cause or a contributing cause of the accident, insurer would not be liable under a clause of the policy providing double indemnity for death resulting solely through external, violent, and accidental means, not contributed to directly or indirectly by physical or mental infirmity or disease.

**4. Insurance § 3—**

While ambiguity in a policy of insurance must be construed against insurer, if the terms of a policy are plain and unambiguous the court must give effect to such language and may not by interpretation enlarge the meaning of its terms.

APPEAL by plaintiff in each case from *McLean, J.,* 7 May 1962 Civil "A" Term of Mecklenburg.

These actions were instituted to recover under Accidental Benefit Agreements (supplementary to ordinary life insurance policies) providing for the payment of additional amounts equal to the face amounts of the policies.

These cases were consolidated and tried together by consent, since the plaintiff in each case is the widow and primary beneficiary under the three life insurance policies issued to the deceased, William V. Skillman. The Acacia Mutual Life Insurance Company issued one of these policies in the face amount of $5,000, with the double indemnity provision in the event of accidental death. The other two policies were issued by the defendant Phoenix Mutual Life Insurance Company and were in the face amounts of $2,000 and $1,000 respectively, with the double indemnity provision in the event of accidental death.

The defendant in each of these cases has paid the plaintiff the face amounts of the policies involved without prejudice to the rights of any of the parties with respect to the claims for accidental death benefits.

The pertinent conditions of the two Phoenix agreements were that it would pay such additional amounts "* * * only if the Company shall receive satisfactory proofs * * * (2) that such death resulted, directly and independently of all other causes, from bodily injury effected solely through external, violent, and accidental means * * *.

"This double indemnity benefit shall not be payable if the death of the insured resulted directly or indirectly from, or was contributed to by, any of the following: Physical or mental infirmity or disease * * *."

The pertinent conditions of the Acacia supplementary agreement were that it would pay such additional amount subject to the condition "That upon receipt by the Company * * * of due proof that the death of the insured resulted, directly and independently of

all other causes, from bodily injury sustained solely through external, violent and accidental means * * *.

"This accidental death benefit shall not be payable if the insured's death results directly or indirectly from: * * *

"2. Illness or disease of any kind or physical or mental infirmity."

On 4 April 1959, about 3:30 p.m., the insured, William V. Skillman, a man 50 years of age, was driving his 1958 Ford automobile in a westerly direction on North Carolina Highway No. 27, and as he approached a bridge where the highway crosses the Pee Dee River, at a point approximately 14 miles west of Troy, North Carolina, his automobile went off the right shoulder of the road, down the embankment of the fill, and into the waters of the river which are at this point also a part of the backwaters of Tillery Lake. After the car entered the water, it floated for a period of a few minutes, drifting away from the shore, and sank about 50 or 60 feet from the shore. The highway east of the bridge was straight for a distance of approximately 900 feet.

Kathleen Culp Almond, who saw the Skillman car leave the highway, run down the bank and into the water, testified: "The first thing that I saw that attracted my attention to the car was I was just looking out of the window (of my home) and the car just went down the road, and when it started down the bank, it just left the road, going down the bank. * * * From this window I could see the road for a short distance back from the bridge toward Mt. Gilead. When I first saw the car it was on the road and was proceeding in the direction of the bridge and on toward Albemarle. During the period of time that I was able to see the car, in my opinion it was running at a moderate speed. There was nothing unusual that attracted my attention to the car except that it just ran down the bank, that is all. As to whether I observed anything that might have caused it to run down the bank, such as any other car or anything unusual happening, no, it was the only car on the road right there at the time. The road is straight for some distance back toward Mt. Gilead from there on to the bridge."

Mr. and Mrs. Oliver McIntyre were in a boat on the lake and came under the highway bridge about the time the car entered the water but they did not see the car enter the water. When they saw the car, Mr. McIntyre turned his boat and went up beside the righthand side of the car. Mr. McIntyre testified: "I told him to run his glass down. The water was probably half way from the bottom of the door up to the glass. At that time the man in the car slid over just about center of the seat when I asked him to run the glass down. He ran the glass down a little bit and turned and sort of smiled at me and sat there and stared at me until he went out of sight. * * * When I first called to him and

told him to open the door, he didn't give any indication that he heard me at that time. Then I called to him the second time and told him to roll down the window and I would take him out through the window and that is when he moved for the first time. Then he sort of slid over or moved over towards the right-hand window and got hold of the handle of the window and gave it one turn and then dropped his hands in his lap and sat back. That is all the moves he made until the car sank. Never at any time did he speak to me or answer me. Yes, at that time he was fairly red in the face."

The evidence tends to show that it was approximately five minutes before the body was removed from the car after it sank. He was taken to the shore in the boat of Mr. and Mrs. McIntyre where he was given artificial respiration by several persons, including the Stanly County Rescue Squad. Considerable water came out of his mouth and nose while he was being given artificial respiration.

When the car was removed from the lake it was still in gear and the ignition switch was on.

It is undisputed that the insured had been suffering from atherosclerosis and hypertension for about three years before his death. He had been treated by numerous physicians and the treatment had included restriction to a low salt diet, medication and instructions to reduce and maintain his weight in the low 160's instead of over 180, as it usually was on such examinations except when he had been following the instructions of his doctors.

The record discloses that on 23 April 1956 the insured was involved in a collision with another car while driving through the intersection of Queens and Ardsley Roads in the City of Charlotte, of which he subsequently had no knowledge or recollection whatever; that following his admission to a hospital he was found to have a temporary paralysis of one leg and developed coma for which he was examined and treated by Dr. R. T. Bellows, an expert neurological surgeon; that Dr. Bellows found the paralysis and coma were caused by a cerebral occlusion which in his opinion had occurred and caused loss of consciousness immediately preceding the collision and that the cerebral occlusion had been caused by hypertension.

Following an autopsy by Dr. W. M. Summerville, a Charlotte pathologist with more than twenty years' experience, which autopsy was performed on 5 April 1959, the day following the insured's death, at the request of the plaintiff and with the permission of the coroner of Montgomery County in which the death occurred, Dr. Summerville made a preliminary report on 7 April 1959 (erroneously dated 7 March 1959), in which he said: "From the gross autopsy, it appeared that the deceased did not die from drowning. There was considerable heart

disease demonstrated at the autopsy table. There was a minor lesion demonstrated in the right frontal lobe of the brain. The final interpretation of the cause of death will depend upon microscopic studies. This report will be forwarded to you as soon as completed."

After Dr. Summerville completed his microscopic studies in connection with the autopsy performed on 5 April 1959, he made a final report in which he set out his findings in detail and gave his conclusion as follows: "It is my opinion that the deceased came to his death as a result of the coronary occlusion. There is nothing in the gross and microscopic findings to indicate that the deceased came to his death from drowning or traumatic injuries."

Dr. Summerville in the trial below testified: "As to what I mean by lumen, the heart takes all the blood from the body and pumps it out. It has to be its own blood supply. * * * As to giving the jury some idea as to the diameter or size of the interior of this coronary vessel, lumen, as I found it on that examination, ordinarily the opening of the vessel or vessels which supply the heart are approximately the size of a wood stemmed match. In the arteries which I found in the deceased the arteries were closed down to about pin point size. * * *

"I examined his liver which was markedly enlarged. It was enlarged approximately * * * two and a half inches, below the ribs where it was supposed to be. * * * The spleen which sits underneath the diaphragm was enlarged approximately three times its nomal size. The kidneys were slightly enlarged * * *. I found no water in the stomach. * * *

"On examining the head there was no evidence of fractures of the bony structure of the skull. * * * As I opened the brain I found an irregular cystic area in the front part of the right portion of the brain, measuring approximately 15 by 7 mms. That is approximately one inch by one half inch. There were no other significant findings."

The case was submitted to the jury and the jury answered the following issue in the negative: "Was the death of William V. Skillman caused by accidental means, as alleged in the complaint?"

Judgment was entered on the verdict and the plaintiff appeals, assigning error.

*Carswell and Justice for plaintiff.*
*Cansler and Lockhart for defendants.*

DENNY, C.J.  The plaintiff is entitled to recover under the terms of the policies involved if the insured came to his death, directly and independently of all other causes, from bodily injury sustained solely through external, violent, and accidental means.

On the other hand, the plaintiff is not entitled to recover if at the time of the accident there was an existing disease or illness which co-operated with or contributed to the accident which resulted in his death. Such an accident cannot be considered as the sole cause or as the cause independent of all other causes.

The appellant assigns as error the following portions of the Court's charge to the jury:

"Now, the court instructs you, members of the jury, that there is a difference between accidental death and death by external, accidental means. Accidental means that which happens by chance or fortuitously without intent or design and which is unexpected, un-usual, and unforeseen. Accidental means refers to the occurrence or happening which produces the result and not to the result. That is, accidental is descriptive of the term *Means*. The motivating, creating and causal factor must be accidental in the sense that it is unusual, unforeseen, and unexpected. The emphasis is upon the accidental character or causation, not upon the accidental nature of the element sequence of the chain of causation. The insurance provided in these policies is not against an accidental result. To create liability it must be made to appear that the unforeseen and unexpected result was produced by accidental means. The stipulated payment is to be made only if the death, though unforeseen and unexpected, was effected by means which are external, violent, and accidental." (EXCEPTION NO. 19)

"The court further instructs you, members of the jury, that if you should find that on this occasion in question the deceased was operating his automobile along highway 27 and that as a result of hypertension or heart attack or an arterial occlusion that he lost control of his car and it went out into the water and sank down and he was drowned, that the plaintiff could not recover and it would be your duty to answer this issue 'No.'" (EXCEPTION NO. 20)

"Now, the court instructs you, members of the jury, that our courts have laid down two rules to follow in the case such as this which the court will now give you. One, when at the time of the accident the insured was suffering from some disease but the disease had no causal connection with the accident, the accident is to be considered the sole cause. Second, when at the time of the accident there was an existing disease which cooperating with the accident resulted in the injury or death, the accident cannot be considered the sole cause or as the cause independent of all other means. In other words, if the injury or death was caused by the sum of two causes, namely accident and disease, then the plaintiff cannot recover." (EXCEPTION No. 22)

The appellant further assigns as error that portion of the following

excerpt of the charge within parentheses:

" * * * (T)he court instructs you that if you should find from this evidence and by its greater weight that on this 4th day of April, 1959, that the deceased was operating his automobile along the highway and that while doing so (his automobile left the highway accidentally, as that accidental means has been defined to you, and not as a result of any disease or heart attack or physical or mental infirmity), if you should find those facts by the greater weight of the evidence and you go further and find that the movement of the car went out into the lake and that he was there drowned, the court instructs you that it would be your duty to answer the issue Yes. If you do not so find, you will answer No * * *." (EXCEPTION NO. 23)

This Court has consistently held that there is a distinct difference in the meaning of the terms "accidental death" and "death by external accidental means." In *Fletcher v. Trust Co.*, 220 N.C. 148, 16 S.E. 2d 687, Barnhill, J., later C.J., said: " 'Accidental' means that which happens by chance or fortuitously, without intent or design and which is unexpected, unusual and unforeseen. 29 Am. Jur., 706-7, sec. 931. 'Accidental means' refers to the occurrence or happening which produces the result and not to the result. That is, 'accidental' is descriptive of the term 'means.' The motivating, operative and causal factor must be accidental in the sense that is unusual, unforeseen and unexpected. Under the majority view the emphasis is upon the accidental character of the causation — not upon the accidental nature of the ultimate sequence of the chain of causation." See also *Slaughter v. Ins. Co.*, 250 N.C. 265, 108 S.E. 2d 438, and cf. *Vause v. Equipment Co.*, 233 N.C. 88, 63 S.E. 2d 173.

In our opinion, when the evidence disclosed on this record is considered, the challenged instructions are without prejudicial error and these exceptive assignments are overruled.

The appellant also assigns as error additional portions of the charge but these additional assignments would seem to involve no question of law not presented in those portions of the charge set out hereinabove.

In *Russell v. Glens Falls Indemnity Co.*, 134 Neb. 631, 279 N.W. 287, in considering a policy of insurance similar to that before us, the Court said: "It seems reasonably clear that a policy with the phrase 'resulting directly, independently and exclusively' refers to the efficient, substantial and proximate cause of the disability at the time it occurred. On the other hand, a policy which also has the phrase 'wholly or partly, directly or indirectly, from disease or mental or bodily infirmity' refers to another contributory cause, whether proximate or remote. To illustrate: A person might be standing near a stone

wall and become dizzy and fall and receive a serious injury. Clearly there is an accident. But if the dizziness was caused by an existing illness or disease of the insured, the illness or disease would be the remote or indirect cause of the injury. It would at least in part cause the injury. It would be a contributing and cooperating cause. But, whether a proximate or remote cause, if a contributing cause, there can be no recovery where such a cause is excluded by the policy. If the results of the acident, added to the diseased condition of an insured, produced the ultimate total result, under policy having the phrase 'wholly or in part, directly or indirectly,' there could be no recovery."

In *Knowlton v. John Hancock Mut. Life Ins. Co.*, 146 Me. 220, 79 A 2d 581, the policy excluded injuries, directly or indirectly caused by disease. The insured, an alcoholic, suffered a fall which was due to his alcoholism. The fall produced skull fracture and brain hemorrhages which resulted in death. The Court said: "It is well settled that if a fall produces injuries which in turn cause death, and such fall is caused by disease, the death results at least indirectly from the disease which causes the fall. In such case, the beneficiary cannot recover the additional benefit provided for in the policy, if the policy contains, as here, a provision that the additional benefit will not be payable 'if death results, directly or indirectly, or wholly or partially, or otherwise, from (1) any bodily or mental disease or infirmity.' "

In *Independent Life and Accident Ins. Co. v. Causby*, 94 Ga. App. 305, 94 S.E. 2d 388, the plaintiff affirmatively alleged that chronic rheumatoid arthritis contributed to the death of the insured but was not the disease or condition directly causing the insured's death. The death certificate gave the cause of death, " * * * Disease or condition directly leading to death (a) Cerebral hemorrhage injury to head caused, due to (b), by fall." Under the provisions of the policy, if the physical impairment of the deceased contributed to the fall in whole or in part, directly or indirectly, then there could be no recovery. The Court said: "The only inference this court can draw from the above quoted portion of the death certificate is that chronic rheumatoid arthritis is what caused the insured to fall and that the fall in turn caused a cerebral hemorrhage which resulted in his death. Rheumatoid arthritis being a physical infirmity which contributed directly to the fall which resulted in the insured's death, there could be no recovery under the double-indemnity clause of the policy issued him."

To the same effect are the following decisions: *Franklin v. Mutual Life Ins. Co. of New York*, 216 La. 1062, 45 So. 2d 624; *McGarity v. New York Life Ins. Co.*, 359 Pa. 308, 59 A 2d 47; *Prudential Ins. Co.*

v. Van Wey, 223 Ind. 198, 59 N.E. 2d 721; Lederer v. Metropolitan Life Ins. Co., 135 Pa. Super. 61, 4 A 2d 608; Puszkarewicz v. Prudential Life Ins. Co. of America, 161 Pa. Super. 500, 55 A 2d 431; New England Mut. Life Ins. Co. v. Fleming, 102 F 2d 143.

In Penn v. Insurance Co., 158 N.C. 29, 73 S.E. 99, this Court, in quoting from cases in other jurisdictions, said in effect that where the insured's policies are ambiguous in their terms they are to be construed liberally in favor of the insured, but that " * * * plain, explicit language cannot be disregarded, nor an interpretation given the policy at variance with the clearly disclosed intent of the parties." In this case there was a provision excluding coverage for injury arising directly or indirectly from bodily disease. The Court quoted from White v. Insurance Co., 95 Minn. 77, 103 N.W. 735, saying, " '* * * (I)f the injury be the proximate cause of death, the company is liable, but if an injury and an existing bodily disease or infirmity concur and cooperate to that end, no liability exists. * * * The rule of proximate cause, as applied to actions of negligence, cannot be applied in its full scope to contracts of this nature.' "

The Penn case was here on a petition to rehear in 160 N.C. 399, 76 S.E. 262, and the Court laid down the following rules:

"1. When an accident caused a diseased condition, which together with the accident resulted in the injury or death complained of, the accident alone is to be considered the cause of the injury or death.

"2. When at the time of the accident the insured was suffering from some disease, but the disease had no causal connection with the injury or death resulting from the accident, the accident is to be considered as the sole cause.

"3. When at the time of the accident there was an existing disease, which, cooperating with the accident, resulted in the injury or death, the accident cannot be considered as the sole cause or as the cause independent of all other causes."

We hold that the evidence in this case brings it within Rule 3 as laid down in the Penn case. Other assignments of error, in our opinion, present no prejudicial error and are overruled.

In the trial below, we find

No error.