GEORGE R. HORN v. PROTECTIVE LIFE INSURANCE COMPANY.

(Filed 23 July, 1965.)

**1. Insurance § 45—**

Where insurer tenders the amount of the death claim and resists plaintiff's action on the supplementary contract for accidental death solely on the ground that insured's death was not accidental as defined by the policy, insurer waives its right to deny liability on the ground that notice and proof of loss were not given as required by the policy.

**2. Insurance § 46—**

In an action under supplementary provisions of a policy for additional payments if death of insured results from an accident, plaintiff has the burden of proving death by accident within the definition of that term in the policy.

**3. Insurance § 34— If existing disease is contributing factor in causing death, death does not result exclusively from accidental means.**

This action was instituted on a supplementary contract providing additional benefits if insured's death was caused directly and exclusively by external, violent and accidental means. The evidence was to the effect that insured had theretofore suffered heart attacks, and plaintiff's expert witness testified from his autopsy that the wounds received by insured in the accident were superficial and could not alone have caused death, that the condition of the heart and blood vessels disclosed insured had arteriosclerosis, and that upon the facts of the particular case the shock of the accident could have caused the heart failure and death. *Held:* Nonsuit should have been entered.

APPEAL by defendant from *Froneberger, J.,* September 1964 Civil Session of RUTHERFORD.

On August 20, 1963, defendant insured the life of R. R. Horn for the principal sum of $10,000. The usual provisions in life insurance policies, obligating insurer to pay a specific sum upon proof of death, were in this case supplemented by an endorsement on the policy entitled: "ACCIDENTAL DEATH AND DISMEMBERMENT SUPPLEMENT," which provided:

> If insured "(a) sustains bodily injuries caused directly and exclusively by external, violent and accidental means * * * and (b) sustains one of the losses enumerated in the Schedule of Losses * * * as the result, directly and independently of all other causes, of such injuries, the Company will, upon receipt of due proof of such loss within 60 days after the date of such loss, * * * pay * * * the amount determined in accordance with the Schedule of Losses * * *."

"LIMITATIONS:

"The Accidental Death and Dismemberment Benefits will not be payable for any loss resulting from, or caused, directly or indirectly, or wholly or partly, by

"1.  [ * * * ]

"2.  bacterial infection, whether introduced or contracted accidentally or otherwise (except pyogenic infections which shall occur simultaneously with and through a visible cut or wound which was caused directly and independently of all other causes by external, violent and accidental means), or

"3.  medical or surgical treatment (except as may result directly from surgical operations or procedures made necessary solely by bodily injuries caused directly and independently of all other causes by external, violent and accidental means and furnished within 90 days after the date of such bodily injuries), or

"4.  [ * * * ]

"5.  [ * * * ]

"6.  disease or bodily or mental infirmity * * *."

The Schedule of Losses required payment of the principal sum for:

"Loss of Life.........................................................Principal Sum
"Loss of Both Hands or Both Feet......................Principal Sum
"Loss of Both Eyes............................................. Principal Sum
"Loss of One Hand and One Foot......................Principal Sum
"Loss of One Eye and One Hand....................Principal Sum
"Loss of One Eye and One Foot........................Principal Sum
"Loss of One Hand, or One Foot,
        or One Eye.............................One-half    Principal Sum."

Plaintiff, son of the insured, and beneficiary named in the policy, brought this action to recover $10,000 provided for in the supplemental contract of insurance. He alleged insured's death, on January 13, 1964, was a direct result of bodily injuries sustained by insured, caused directly and exclusively by violent and accidental means.

The court, to settle the rights of the parties, submitted this issue to a jury: "Was the death of R. R. Horn caused by bodily injuries sustained by the said R. R. Horn directly, exclusively and independently of all other causes by external, violent and accidental means, as set

forth in the complaint?" The jury answered "yes." Thereupon, judgment was entered in favor of plaintiff for $10,000. Defendant excepted and appealed.

*Van Winkle, Walton, Buck & Wall; Herbert L. Hyde for Defendant Appellant.*
*Hamrick & Jones for Plaintiff Appellee.*

RODMAN, J.   The first and principal question debated in the briefs and on oral argument is directed to the motion to nonsuit. Defendant asserts the court's ruling was erroneous for two reasons:

First, plaintiff alleged, and defendant denied, that proof of loss required by the policy had been given. Plaintiff must establish compliance with policy provisions to recover, and proof of loss is a condition precedent. If this case had been tried on the theory that plaintiff had not filed proof of loss, as required by the policy, we would feel compelled to reverse for that reason; but it is manifest from the record, and tacit admission in appellant's brief, that the court and counsel understood that defendant's liability depended on proof at the trial that insured's death was the result of injuries, as defined in the policy. Defendant did not tender an issue relating to proof of death. It requested no instructions relating to proof. It is stated in appellee's brief that defendant paid the $10,000 called for by the policy proper, by check, stating it was in full settlement of all claims against defendant. Plaintiff declined to accept the check as a full settlement. It was cashed with the understanding that it would not in any manner affect plaintiff's right to maintain this action.

Defendant's position was a waiver of its formal denial in its answer that plaintiff had not filed proof of loss. To hold otherwise would not only be unjust to the litigants but unjust to the court and the counsel that participated in the trial.

The second reason assigned to support the motion to nonsuit is not so easily disposed of. An interpretation of the insuring provisions of the Accidental Death Supplement is necessary to ascertain the extent of defendant's obligation under its contract, and the application of the evidence to the contractual obligations.

Plaintiff has the burden of proof. His evidence must be sufficient to permit a jury to find death resulted directly and independently of all other causes from bodily injuries caused directly and exclusively by violent and accidental means. *Langley v. Insurance Co.,* 261 N.C. 459, 135 S.E. 2d 38; *Slaughter v. Insurance Co.,* 250 N.C. 265, 108 S.E. 2d 438; *Penn v. Insurance Co.,* 158 N.C. 29, 73 S.E. 99; *Tix v. Employers Casualty Company,* 368 S.W. 2d 105; *Hume v. Standard Life & Acci-*

*dent Insurance Co.*, 365 P. 2d 387; *New York Life Insurance Co. v. Rees*, 341 S.W. 2d 246; *Newton v. Colonial Life & Accident Insurance Co.*, 149 F. Supp. 113; *Dauphin Deposit Trust Co. v. Lumbermens Mut. Cas. Co.*, 90 A. 2d 349; *Lucas v. Metropolitan Life Ins. Co.*, 14 A. 2d 85, 131 A.L.R. 235; *Calkins v. National Travelers' Ben. Ass'n of Des Moines*, 204 N.W. 406, 41 A.L.R. 363.

The evidence is sufficient to permit a jury to find these facts:

Insured died between 1:00 and 2:30 a.m. on Sunday, January 13, 1964. He was 72 years of age. He and his son were partners. Their business was extensive. They had the franchise for the Buick automobile at Forest City. They operated a used car lot. They had extensive real estate holdings, including rental properties and a small farm near Bostic. Insured looked after the real estate business and the farm, supervising the maintenance and repair of the buildings. He was active in buying and selling livestock, which he took to the farm for resale. His principal work in connection with the automobile business was in driving cars to and from dealers in other towns to Forest City.

During the week preceding his death, he had driven a car from Greensboro to Forest City; and about three weeks prior thereto, he had driven a car from Atlanta to Forest City. On Friday, prior to his death, he purchased four calves. He loaded and hauled these to his farm. He worked all day on Saturday prior to his death. He worked until the usual closing time, 6 to 7 p.m. He seemed to those who saw him at work on Saturday to be in good health.

About 8:30 p.m. he and a companion, pursuant to a prior agreement, left for insured's camp near Marion. There they prepared and ate an oyster stew. After supper they looked at television. During that period he appeared to his companion to be in good health. He looked for his medicine but could not find it. They left for home about 1:00 a.m. It was cold, raining and sleeting. Ice on the windshield was brushed off with a sack. The companion testified: "The windshield wipers were working but it was very poor on account of the ice, rain and weather." Because the road was slick, insured was driving 15-25 miles per hour. The companion felt the rear end of the car slide. It ran off the paved portion of the highway, across two ditches, through woods, down a 90 foot embankment, coming to rest only when it violently collided with a large tree.

As soon as the vehicle came to rest, the companion turned off the ignition switch and jumped out. He proceeded immediately to the highway to seek assistance. Perhaps an hour elapsed before help arrived.

The first person to see the insured after the car left the highway expressed the opinion insured was then dead. "He had his arms upon

the steering wheel, his head down like this. I walked around to the other side of the car and Mr. Horn went over to the right and his arms dropped down to the passenger side. * * * Mr. Horn's body was not lying down in the front seat. It was kind of slumped over that way. He was still half sitting up and half laying over in the seat. As to his hands, as I remember, one hand was down on his leg and in his lap." A few minutes thereafter, insured was placed on a stretcher and taken to a hospital. The coroner saw the body at the hospital about 2:30 a.m. He testified: "I observed Mr. R. R. Horn after I got to the hospital. He was then dead. I observed that he was bruised on the right side of his forehead, with cuts and bruises and blood running down his eyes."

A highway patrolman responded to the call for assistance. He reached the wreck between 1:30 and 2:00 a.m., about 15 minutes ahead of the ambulance. He expressed the opinion that insured was dead when he first saw him. He described insured's position in the automobile. He testified as to the location of the automobile, the fact that it had hit a large tree, rendering it impossible for one to get out of the driver's side. He made no reference to any signs of external injuries, merely saying, "I noticed there was saliva or mucous coming out of his mouth dripping on the seat."

Plaintiff arrived at the hospital shortly after the ambulance. His father was then dead. Describing the body, he said: "With reference to my father's head and face, I saw the whole righthand side of his face, he was blue up through here above his eye and all in here and he had a cut across his eye here, right along here and there was blood in his right eye and some running down his face."

An autopsy was made by Dr. Reese, pathologist, on Sunday morning, the 13th. He testified:

> "[T]he external auditory canals were free from blood and fluid and there were superficial laceration or cut over the right eyebrow, these associated with a few mild excorations [*sic*] of the skin. A superficial laceration is a very small cut. Mild excorations [*sic*] are scratches on the skin in that particular area. There was also some bleeding into the soft tissues of the skin and subcutaneous tissue, that is right under the skin, over the right forehead. The neck was normal in contour and there was a superficial scratch on the left side of the chin. * * * There was a superficial laceration over the posterior aspect of the right hand and bruises and superficial excoriations, involving the skin and soft tissues of each knee."

He testified there was no evidence of blood or injury to the brain or other organs of the body, other than the heart.

"The heart weighed 550 grams, enlarged about 10 to 15%. There was superficial scars on the surface of the heart. On opening the heart, there was extensive scarring, some softening and also old adhesions involving heart muscles itself. The chambers of the heart were normal in proportion, guarded by competent valves. The blood supply showed extensive hardening of the arteries, placques of calcium deposit. These greatly reduces the size of the vessels and there was one vessel, the left anterior had a very small blood clot. The aorta, and the great vessels of the body were essentially normal, but did show extensive hardening of the arteries, arteriosclerosis. * * * There were gall stones in the gall bladder and some scarred areas near the fundus.

"In regard to those supervicial [sic] lacerations or scratches on the skin on the outside of the body, I have an opinion satisfactory to myself as to whether or not they were of major importance sufficient to produce death, and in my opinion they were minor and did not represent major injuries to the body or the organs contained therein. * * * I have an opinion satisfactory to myself as to the cause of the death of Mr. R. R. Horn. It is my opinion that death resulted from severe heart disease that was demonstrated in the finding of hardening of the arteries and the occlusion of the arteries."

On cross examination by plaintiff, Dr. Reese was asked if he had not in a supplemental report said: "I think it would be most proper and probable to assume that the anxiety, apprehension and concern experienced by Mr. Horn following the accident actually precipitated the heart attack." He answered that he did, and stated that was his medical opinion. He then said:

"A person who has had a heart attack might have a susceptibility to another heart attack. This might be activated by a person going over a 90 foot fill in an automobile on a dark night. * * *

"On the information I got from the autopsy itself and examination of this patient, and medical history, I looked at, I would not be able to form an opinion as to whether or not anxiety or apprehension may have caused a heart attack of Mr. Horn."

He was then asked the question:

"Now, Doctor, if the Jury should find from the evidence in this case that the deceased, Mr. R. R. Horn, 72 years of age, on the night of his death was riding along U. S. Highway 221 and went over an embankment in an automobile 90 feet below the highway

and the car struck a tree and came to a violent stop, would it be your opinion that could cause death, by shock alone?"

He responded that he had an opinion, and in his opinion it could produce death.

The evidence shows without contradiction that insured had suffered from heart attacks. Plaintiff testified he had been so informed by his father's doctor "about 10 years ago." Insured had a gall bladder ailment and "had a real bad right hip, had calcium deposit on it."

The death certificate filed with the Register of Deeds said:

"Cause of death, Part I: Myocardial infarction, old and acute due to coronary artery disease, arteriosclerotic and acute thrombotic. Part II: Victim involved in a single car auto accident approximately one hour before death, no evidence of major injury sufficient to produce death * * *."

Rutherford Hospital records show that insured was a patient there from October 20, 1956 to November 26, 1956; from May 21, 1959 to May 25, 1959; from June 3, 1959 to June 8, 1959; from August 9, 1960 to August 15, 1960; from September 11, 1962 to September 18, 1962 and from August 18, 1963 to August 22, 1963. The final diagnosis made on his discharge on August 22, 1963 listed, among other diseases from which insured was suffering, "Arteriosclerotic cardiovascular disease." Each of the other hospital records refer to his heart condition.

The crucial question is: Does the evidence, fairly interpreted in the light most favorable to plaintiff, suffice to establish death for which compensation must be paid under the policy provisions? For an answer, we look to prior decisions of this Court and the conclusions reached by the appellate courts of sister states.

*Penn v. Insurance Co.*, 160 N.C. 399, 76 S.E. 262, is the leading case in this State. Walker, J., there said:

"[I]t appears that under policy contracts such as the one under consideration, three rules may be stated:

"1. When an accident caused a diseased condition, which together with the accident resulted in the injury or death complained of, the accident alone is to be considered the cause of the injury or death.

"2. When at the time of the accident the insured was suffering from some disease, but the disease had no causal connection with the injury or death resulting from the accident, the accident is to be considered as the sole cause.

"3. When at the time of the accident there was an existing disease, which, cooperating with the accident, resulted in the in-

jury or death, the accident cannot be considered as the sole cause or as the cause independent of all other causes."

The rules there stated have been repeated and applied as the proper yardstick to determine liability in subsequent cases. *Skillman v. Insurance Co.*, 258 N.C. 1, 127 S.E. 2d 789; *Harris v. Insurance Co.*, 193 N.C. 485, 137 S.E. 430.

Courts of sister states have, either expressly or by application, approved the rules as stated by Justice Walker. See *Crowder v. General Accident, Fire & Life Assur. Corp.*, 21 S.E. 2d 772; *The MacCabees v. Terry*, 67 So. 2d 193; *Fries v. John Hancock Mutual Life Ins. Co. of Boston*, 360 P. 2d 774; *Tomaiuoli v. U. S. Fidelity and Guaranty Co.*, 182 A. 2d 582; *Brown v. United States Fidelity & Guaranty Co.*, 147 N.E. 2d 160; *Bouchard v. Prudential Ins. Co. of America*, 194 A. 405; *Provident Life & Accident Ins. Co. v. Campbell*, 79 S.W. 2d 292. In that case the court summarized the rule to determine liability in this language:

"The rule we deduce from the cases involving accident insurance contracts similar to those here under consideration, is that, if the insured, at the time of the alleged accidental injury, was also suffering from a disease, and the accident aggravated the disease, or the disease aggravated the effects of the accident and actively contributed to the disability or death, there can be no recovery upon the policy."

The court further said:

"[T]hat a purely 'mental shock,' due to excitement or 'mental disturbance' such as that disclosed by the proof in the record before us, is not a bodily injury within the contemplation of the insurance contracts involved in these cases."

Plaintiff, in § 14 of his complaint, alleged insured suffered shock, blows and injuries which "caused his heart to stop beating and caused his death." The evidence supports the allegation that the immediate cause of death was the failure of the heart to perform its normal function. The evidence is sufficient to support a finding that the shock or excitement created by running off the road and striking the tree caused a strain on the heart and blood vessels, which they, because of the diseased condition, could not stand. This is as far as the evidence will warrant a factual finding. We conclude it is not sufficient under the restricted insuring provisions of the accidental death portion of the policy to impose liability. In reaching this conclusion, we are advertent to the irreconcilable conflict in the conclusions reached by courts in constru-

ing and applying provisions of policies providing for accidental death. Multitudinous cases indicating variant interpretations and results are assembled in the ANNOTATION: "Preexisting physical condition as affecting liability under accident policy or accident feature of life policy." 84 A.L.R. 2d 176, *et seq*. See particularly pp. 255-281; 29A Am. Jur., Insurance § 1212; 45 C.J.S. pp. 1088, 1089; 10 Couch on Insurance 2, § 41.75.

Reversed.