WERNER INDUSTRIES, INC., A NEW JERSEY CORPORATION, PLAINTIFF–RESPONDENT, v. FIRST STATE INSURANCE COMPANY, A DELAWARE CORPORATION, DEFENDANT-APPELLANT.

THE RICE AGENCY, A NEW JERSEY CORPORATION, DEFENDANT AND THIRD PARTY PLAINTIFF, v. WEGHORN INTERNATIONAL, INC., THIRD PARTY DEFENDANT.

Argued February 1, 1988—Decided October 11, 1988.

*Donald J. Volkert, Jr.,* argued the cause for appellant (*Siff, Rosen & Parker,* attorneys; *Robert F. Walsh,* on the briefs).

*Peter R. Bray* argued the cause for respondent (*Cole, Geaney, Yamner & Byrne,* attorneys).

PER CURIAM.

The question in this case is whether the coverage under an excess "umbrella" liability insurance policy must "drop down" to become the first line of coverage for risks covered by the primary liability insurance carrier in the event of the primary carrier's insolvency. We hold that the language of the excess policy here does not call for that result, and reverse the contrary ruling of the court below.

I

The facts of this case are quite simple. Werner Industries, Inc. (Werner) bought products liability insurance from two sources through the Rice Agency, an insurance broker. Werner purchased the first line of products liability coverage of $500,000 for bodily injury and $250,000 for property damage from Ambassador Insurance Company (Ambassador). Werner also bought an excess policy from First State Insurance Company (First State) to cover liability in excess of the amount set forth on the Ambassador policies. Under normal circumstances, Werner's personal injury insurance coverage from both its

primary policy, with Ambassador, and its "umbrella" policy,[1] with First State, could be represented schematically by this diagram:

$ 3,000,000

First State's risk

$ 500,000 — Ambassador's coverage

Unfortunately, Ambassador has become insolvent. Under the New Jersey Surplus Lines Insurance Guaranty Fund Act (Guaranty Fund), *N.J.S.A.* 17:22–6.70 to –6.83, Werner Industries is provided with coverage in the amount of $300,000. (At the time of this decision, the Guaranty Fund has insufficient funding and is only paying 40% of all claims, with a promise to pay the balance in the future if funding permits.) Several personal injury suits have been brought against Werner Industries, with a potential liability well in excess of the Guaranty Fund. Before us, Werner argues that under the umbrella or excess policy First State is obligated to provide the coverage

---

[1]Werner paid $5,000 for this umbrella coverage. In this age of escalating liability insurance premiums, we can well imagine that First State might have rated this policy differently had the customer been buying the potential first line of coverage, and Werner might have expected to pay a greater premium.

between what the Guaranty Fund will pay, $300,000, and what would have been provided under the primary policy if Ambassador had not become insolvent, *i.e.*, an additional $200,000 of coverage. (Under the Guaranty Fund as currently funded, Werner would receive only 40% of $300,000, or $120,000, thus requiring an additional $380,000 of coverage.) First State contends that it is obligated to pay only sums in excess of the amount shown on the underlying policy—in this case, sums in excess of $500,000 for a personal injury claim up to an aggregate maximum of $3 million.

In an action for declaratory judgment, plaintiff asserted that the policy "language requires First State to assume the risk of the primary insurer's insolvency and it should be required to pay, starting with the first dollar, any judgment entered against Werner." On cross-motions for summary judgment, the Law Division found that the insuring agreement as written provided coverage for the ultimate net loss only in excess of the amount of underlying insurance listed on the schedule of the First State policy. The policy itself, the Law Division observed, "is not ambiguous merely because two words, read without reference to any other provisions in the policy, suggest an ambiguity." The policy states that the company shall be liable for the ultimate net loss only in excess of the greater of (a) an amount equal to the limits of liability indicated on the schedule of other coverage (here the $500,000 policy of Ambassador) or (b) $10,000 for other risks that are not covered by the Ambassador policy. (The risks in dispute are clearly covered by the Ambassador policy.) The Law Division thus concluded that "it is plain that the parties contemplated that First State would not be obligated to make any payment until the first $500,000.00 for personal injury or $250,000.00 for property damage was paid out from some other source."

The Appellate Division reversed the trial court and remanded for entry of judgment in favor of Werner. 217 *N.J.Super.* 436 (1987). It found that the language in the policy describing First State's umbrella coverage as " 'in excess of the *amount recov-*

*erable* under the underlying insurance' (emphasis added)" is "substantially ambiguous" and "can reasonably be interpreted to expose [the excess carrier] to liability for amounts which the insured is not able to recover from the underlying insurer because of its insolvency." *Id.* at 444–45. The referenced language appeared on the "Declarations" page of the First State policy, that is, the page that contains the numerical limits of liability. As noted, the Law Division relied on the insuring agreement itself, which provided that the company would be liable for the loss only in excess of the "limits of liability indicated beside the underlying insurance." [2] The Appellate Division, observing that "the declaration page is set forth in bold face print in contrast to the insuring agreement," found the declaration and agreement language to be "clearly inconsistent" and resolved that perceived ambiguity against the insurer. *Id.* at 446.

## II

■■ The fundamental principle of insurance law is to fulfill the objectively reasonable expectations of the parties. *See, e.g., Zuckerman v. National Union Fire Ins. Co.,* 100 *N.J.* 304 (1985). Nevertheless, "[t]he recognition that insurance policies are not readily understood has impelled courts to resolve ambiguities in such contracts against the insurance companies." *Sparks v. St. Paul Ins. Co.,* 100 *N.J.* 325, 336 (1985) (citations omitted). At times, even an unambiguous contract has been

---

[2]The Law Division referred as well to additional provisions of the policy, including Condition (g), which provided that First State's coverage was not available "unless and until the INSURED, or the INSURED'S underlying insurer, shall be obligated to pay the amount of the UNDERLYING LIMIT," and Condition (o) of the policy, which required Werner to maintain the underlying policy in force and effect during the effective dates of the First State policy, and if it fails to do so, the First State policy "shall apply in the same manner it would have applied had such policy been so maintained in force." The Appellate Division placed no significance on this Condition since Werner had maintained the policy in force. It was not through Werner's fault that Ambassador became insolvent.

interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured:

> The interpretation of insurance contracts to accord with the reasonable expectations of the insured, regardless of the existence of any ambiguity in the policy, constitutes judicial recognition of the unique nature of contracts of insurance. By traditional standards of contract law, the consent of both parties, based on an informed understanding of the terms and conditions of the contract, is rarely present in insurance contracts. W.D. Slawson, "Standard Form Contracts and Democratic Control of Lawmaking Power," 84 *Harv.L.Rev.* 529, 539–41 (1971); *R. Keeton, Insurance Law* 350–52 (1971). Because understanding is lacking, the consent necessary to sustain traditional contracts cannot be presumed to exist in most contracts of insurance. Such consent can be inferred only to the extent that the policy language conforms to public expectations and commercially reasonable standards. *See* W.D. Slawson, *supra*, 84 *Harv.L.Rev.* at 566; *R. Keeton, supra*, at 350–52. In instances in which the insurance contract is inconsistent with public expectations and commercially accepted standards, judicial regulation of insurance contracts is essential in order to prevent overreaching and injustice. *R. Keeton, supra*, at 350–52; R. Keeton, "Insurance Law Rights at Variance with Policy Provisions," 83 *Harv.L.Rev.* 961, 967 (1970). [*Sparks, supra*, 100 *N.J.* at 338.]

■ We agree with the Law Division that taken in its entirety the language of the policy is plain in its meaning. It does not provide drop-down coverage in the event of the primary insurer's insolvency. We also conclude on this record that, so interpreted, the policy is not "inconsistent with public expectations [or] commercially accepted standards."

We recognize that some courts have reached the contrary conclusion. Massachusetts has held (at least in the case of personal-line coverage of an individual) that when the policy does not explicitly confront the consequences of insolvency, and the policy provides for drop-down coverage when the primary policy's underlying limit is "reduced," the excess carrier's responsibility should drop down to fulfill the reasonable expectations of a hypothetical insured. *Massachusetts Insurers Insolvency Fund v. Continental Casualty Co.,* 399 *Mass.* 598, 506 *N.E.*2d 118 (1987). Chief Justice Marshall of Georgia, having thoroughly canvassed the varying authorities, denied drop-down coverage in the case before his court, relying however on a narrow distinction in that policy requiring that "other insurance," but not the "underlying insurance," be "collectible"

before the excess carrier be obligated to indemnify. *United States Fire Ins. Co. v. Capital Ford Truck Sales, Inc.*, 257 *Ga.* 77, 355 *S.E.*2d 428, 433 (1987). Using similar reasoning, the Appellate Division in our case emphasized that the Declarations page of the policy referred to First State's liability being " 'in excess of the *amount recoverable* under the underlying insurance' (emphasis added)." 217 *N.J.Super.* at 444.

Other courts, however, have emphasized that courts should not focus "on one sentence of th[e] policy's 'Conditions' section * * * to the exclusion of the balance of the contract. Such an interpretation is distorted and legally inappropriate." *Wurth v. Ideal Mut. Ins. Co.*, 34 *Ohio App.*3d 325, 518 *N.E.*2d 607, 612 (1987) (excess liability carrier not required to drop down to cover losses indemnified by insolvent primary carrier); *see also Pergament Distributors, Inc. v. Old Republic Ins. Co.*, 128 *A.D.*2d 760, 513 *N.Y.S.*2d 467 (A.D.1987) (limits of liability that referred to sum in excess of amounts "covered" by underlying insurance did not signify collectibility).

██ In the last analysis, a "policy that fulfills the reasonable expectations of the insured with respect to the scope of coverage" is valid and enforceable. *Zuckerman v. National Union Fire Ins. Co., supra*, 100 *N.J.* at 324. The history of this litigation illuminates the expectations of the parties:

(1) Werner initiated this action because it wanted to be certain that First State was obligated to provide coverage "above the limits of the primary carrier." We can only interpret this language as meaning solely those losses in excess of the $500,000 Ambassador policy. In the action Werner also sought damages from its commercial insurance broker, the Rice Agency, for negligently or fraudulently placing the primary insurance coverage with Ambassador.

(2) First State stipulated to its coverage in excess of the Ambassador policy and sought a discontinuance of Werner's action against it. Werner could have continued its suit against its insurance broker. However, Werner then shifted its tactics

and contended that the excess liability policy required First State to cover losses in excess of the $300,000 available from the Guaranty Fund.

(3)   However, Werner's strategy before the trial court was to contend that due to the Guaranty Fund's insufficient funding, First State was "required to pay, starting with the first dollar, any judgment entered against Werner" in pending personal injury litigation, less any amount eventually paid by the Guaranty Fund.

It is difficult for us to see in this scenario of events anything other than a litigation strategy designed to make the best of a bad situation.   We say this without any criticism, but merely to point out that on this record we cannot conclude that it was within the commercial expectations of Werner Industries that its umbrella carrier was to be its primary carrier in case of that carrier's insolvency.

In other circumstances, "[b]ecause insurance contracts are contracts of adhesion, the terms of which are not customarily bargained for, courts have a special responsibility to prevent the marketing of policies that provide unrealistic and inadequate coverage." *Sparks v. St. Paul Ins. Co., supra,* 100 *N.J.* at 341.   Were this a policy of personal insurance coverage, we might be more inclined to accept the Appellate Division's view as a matter of public policy.   After all, a line in the policy would cover the issue.   But this is a policy covering commercial risks procured through a broker, and thus involved parties on both sides of the bargaining table who were sophisticated with regard to insurance.

Because, in our view, the policy here provided neither unrealistic nor inadequate coverage, and because there has been no showing whatsoever that this policy did not meet Werner's expectations, we reverse.   Application of canons of construction dictating interpretation against a drafter "should be sensible and in conformity with the expressed intent of the parties." *Broadway Maintenance Corp. v. Rutgers,* 90 *N.J.*

253, 271 (1982). Such canons "should not to be used as excuse to read into a private agreement that which is not there, and that which people dealing fairly with one another could not have intended." *Tomaiuoli v. United States Fidelity and Guar. Co.*, 75 *N.J.Super.* 192, 207 (App.Div.1962). Our goal always is to "justly fulfill the reasonable expectations of the assured in the purchase of his insurance policy." *Burd v. Sussex Mut. Ins. Co.*, 56 *N.J.* 383, 400 (1970) (Jacobs, J., dissenting). In the present case, the language of the policy clearly did not provide for any "dropping down" by the secondary insurer for losses not recoverable by reason of the insolvency of the primary insurer. Absent evidence that some other action by First State created a different understanding by the insured, the unambiguous language of the contract must be enforced.

We therefore remand the matter, as we did in *Sparks v. St. Paul Ins. Co.*, *supra*, 100 *N.J.* at 342 n. 6, to permit the trial court to consider proof of whether "the terms of this policy were specifically understood and bargained for." In this context, that would mean inquiring into any background evidence that the insured, through its broker, conveyed to the insurer a contrary intent than that found in the unambiguous language of the policy and was induced to enter this policy by the insurer's conduct. We note further that Werner may have a remedy against the Rice Agency, its commercial broker, on a theory of broker's negligence if the umbrella policy provided by the broker did not provide the coverage it undertook to supply because of its failure to exercise requisite skill or diligence. In negotiating that policy with the insurer, the broker may become liable to his principal for the loss sustained by the insured. *See Bates v. Gambino*, 72 *N.J.* 219 (1977).

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division for further proceedings in accordance with this opinion.

HANDLER, J., dissenting.

I would affirm the judgment of the Appellate Division, substantially or the reasons expressed in the opinion of Judge Baime, reported at 217 *N.J.Super.* 436 (1987).

*For reversal and remand*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For affirmance*—Justice HANDLER—1.