SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Oxford Realty Group Cedar v. Travelers Excess and Surplus Lines Company** (A-85-15) (077617)

**Argued January 31, 2017 -- Decided May 25, 2017**

**FERNANDEZ-VINA, J., writing for a majority of the Court.**

In this appeal, the Court considers coverage under a surplus lines insurance contract and determines whether debris removal coverage applies in addition to the policy's endorsement limiting flood coverage for all losses "resulting from Flood to buildings, structures or property in the open" in the covered flood zone.

Plaintiffs Oxford Realty Group Cedar, CLA Management, and R.K. Patten LLC (collectively, Oxford) own and manage an apartment complex located on in Long Branch, New Jersey (the Property). The Property is located in Flood Zone A according to National Flood Insurance Program classifications. Oxford entered into an insurance contract with defendant Travelers Excess and Surplus Lines Company (Travelers) to insure the Property.

The Property suffered significant flood damage when Superstorm Sandy struck New Jersey in October 2012. Oxford submitted a claim to Travelers pursuant to the Policy. Oxford claimed flood damage in excess of $1,000,000 and $207,961.28 in debris removal costs. Travelers asserted that all damage caused by the flood was subject to the $1,000,000 limitation for a flood occurrence and paid Oxford only $1,000,000 on its claim.

In July 2013, Oxford sued Travelers in Superior Court. Both parties moved for partial summary judgment on the issue of Travelers' liability for the debris removal costs.

The trial court granted partial summary judgment in favor of Travelers. The court did not find the Policy to be ambiguous regarding flood coverage and debris removal coverage. The court acknowledged that the Supplemental Coverage Declarations appeared to allow additional debris removal coverage but concluded that the Limit of Insurance for Flood nullified any coverage for flood damage above $1,000,000.

The court further held that "the general condition that the debris removal is an additional coverage must yield to the specific term in the Supplemental Coverage Declarations that the [$1,000,000] coverage applies to 'all losses' caused by flood." Accordingly, the trial court granted partial summary judgment in favor of Travelers. In August 2014, the court granted summary judgment in favor of Travelers on all remaining counts.

The Appellate Division reversed the grant of summary judgment and remanded for entry of judgment in favor of Oxford. The panel concluded that the Policy required the provision of up to $500,000 for debris removal coverage in addition to the $1,000,000 flood limit. The panel held that the $1,000,000 limitation in the Supplemental Coverage Declarations applied only to insured buildings rather than insured occurrences. In contrast, the panel held that the Property Coverage Form's additional debris removal coverage applied to all Covered Property, not just Oxford's buildings. The panel further reasoned that the Flood Endorsement did not limit Oxford's damages to $1,000,000 because the endorsement applied "only to loss or damage to <u>covered property caused by flood</u>, meaning Oxford's <u>building</u>." (Emphasis added).

The Court granted Travelers' petition for certification. 227 <u>N.J.</u> 216 (2016).

**HELD**: Although the Policy assigns debris removal a coverage sublimit, it does not constitute a self-contained policy provision outside the application of the $1,000,000 flood limit. Because the terms of the Policy are not ambiguous, the Court need not address contentions about <u>contra proferentem</u> or the doctrine of reasonable expectations.

1. Surplus lines insurance policies, governed by <u>N.J.S.A.</u> 17:22-6.40 to -6.84, offer coverage in specialized situations. Surplus lines policies insure risks which insurance companies authorized or admitted to do business in New Jersey have

refused to cover by reason of the nature of the risk. These policies are unique in that the insured parties engage in high risk enterprises for which insurance could only be obtained from a surplus lines carrier through a broker. Insureds procure surplus lines policies covering commercial risk through insurance brokers, thus involving parties on both sides of the bargaining table who are sophisticated regarding matters of insurance. (p. 13)

2. In assessing the meaning of provisions in an insurance contract, courts first look to the plain meaning of the language at issue. If the language is clear, that is the end of the inquiry. If an ambiguity exists, the court will resort to tools and rules of construction beyond the corners of the policy. But courts will not manufacture an ambiguity where none exists. An insurance policy is not ambiguous merely because two conflicting interpretations of it are suggested by the litigants. Nor does the separate presentation of an insurance policy's declarations sheet, definition section, and exclusion section necessarily give rise to an ambiguity. (pp. 13-15)

3. Ordinarily, our courts construe insurance contract ambiguities in favor of the insured via the doctrine of contra proferentem. Sophisticated commercial insureds, however, do not receive the benefit of having contractual ambiguities construed against the insurer. Similar to the doctrine of contra proferentem, the doctrine of reasonable expectations, under which the insured's "reasonable expectations" are brought to bear on misleading terms and conditions of insurance contracts, is less applicable to commercial contracts. (pp. 15-16)

4. The Flood Endorsement places a hard cap on the amount recoverable for flood damage. Under that section, "[t]he most [Travelers] will pay for the total of all loss or damage caused by Flood . . . is the single highest Annual Aggregate Limit of Insurance specified for Flood shown in [Section B.14 of] the Supplemental Coverage Declarations." (Emphasis added). Section B.14 sets that Limit of Insurance at $1,000,000. Thus, the Flood Endorsement categorically denies any flood damage coverage in excess of $1,000,000. The Flood Endorsement also clarifies that this $1,000,000 ceiling will apply even if more than one Limit of Insurance applies, such as the Limit of Insurance for debris removal in the Supplemental Coverage Declarations. There is no indication that this limitation applies only to Oxford's buildings. The Policy limits Oxford's flood coverage to $1,000,000 and therefore will be enforced as written. (pp. 16-19)

5. The Eighth Circuit addressed a similar issue in Altru Health System v. American Protection Insurance Co., 238 F.3d 961 (8th Cir. 2001). The insured plaintiff and insurer defendant contracted to cover a commercial hospital. One section of the contract provided coverage for losses incurred during "Interruption by Civil Authority." A severe flood damaged the hospital and caused a civil authority to close the hospital temporarily. The insured claimed that losses sustained from the civil authority's closure of the hospital applied in addition to the $1,500,000 flood limit. The court reasoned that the Civil Authority coverage was not "a self-contained policy provision" to which the flood limit did not apply. Rather, the court held that the $1,500,000 flood limit applied to all damages caused by an occurrence of flood, even if the contract assigned individual sublimits to specific types of damages. Thus, Altru Health supports the conclusion that the $500,000 debris removal limit does not apply in addition to the Flood Endorsement's $1,000,000 limit. Although the Policy assigns debris removal a coverage sublimit, it does not constitute a self-contained policy provision outside the application of the $1,000,000 flood limit. (pp 19-20)

6. Because the Court does not find the terms of the Policy ambiguous, it does not address Oxford's contentions about contra proferentem or the doctrine of reasonable expectations. (pp 20-21)

The judgment of the Appellate Division is **REVERSED**, and the trial court's grant of summary judgment in favor of Travelers is **REINSTATED**.

**JUSTICE ALBIN, DISSENTING**, expresses the view that the insurance contract is hopelessly ambiguous and needlessly complex. Because reasonable minds can differ about the meaning and interplay of the flood insurance and debris removal clauses in the insurance policy and because Travelers drafted the ambiguous policy terms, the insured's interpretation should prevail under the doctrines of contra proferentem and reasonable expectations, according to Justice Albin.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE ALBIN filed a separate, dissenting opinion in which JUSTICE TIMPONE joins.**

2

OXFORD REALTY GROUP CEDAR,
CLA MANAGEMENT, and R.K.
PATTEN, LLC,

    Plaintiffs-Respondents,

       v.

TRAVELERS EXCESS AND SURPLUS
LINES COMPANY,

    Defendant-Appellant.


       Argued January 31, 2017 – Decided May 25, 2017

       On certification to the Superior Court,
       Appellate Division.

       Wystan M. Ackerman, a member of the
       Connecticut and New York bars, argued the
       cause for appellant (Robinson & Cole,
       attorneys; Mr. Ackerman and Michael J.
       Mernin, on the brief).

       Allan Maitlin argued the cause for
       respondents (Sachs, Maitlin, Fleming &
       Greene, attorneys; Mr. Maitlin and
       Christopher Klabonski, on the brief).


    JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

    In this appeal, we consider competing arguments about a surplus lines insurance contract's coverage for a flood occurrence. Specifically, we are called upon to determine whether debris removal coverage applies in addition to the policy's endorsement limiting flood coverage for all losses

"resulting from Flood to buildings, structures or property in the open" in the policy's covered flood zone.

The insured contracted, through the services of a licensed broker, with the insurer to obtain the surplus lines coverage for certain commercial apartment buildings. The insurance policy provided limits of insurance for the insured's buildings and business personal property. The policy also listed limits of insurance for various occurrences and expenses, including debris removal. According to the policy, the debris removal coverage could apply in addition to certain limits of insurance for covered property under certain conditions.

Although the original insurance policy disclaimed all flood coverage, the parties added an endorsement to obtain access to flood coverage. The endorsement limited flood coverage to $1,000,000, a sum delineated in the supplemental coverage declarations.

The insured's property sustained severe damage during Superstorm Sandy. The insured claimed debris removal coverage in addition to $1,000,000 in flood damage. The insurer refused to pay any amount above the $1,000,000 flood damage cap in the endorsement. The insured sued for the debris removal coverage.

The trial court determined that the policy unambiguously capped the insured's recovery at $1,000,000. The Appellate

Division reversed and held that the debris removal provisions applied in addition to the $1,000,000 flood limit.

For the reasons set forth in this opinion, we hold that the insurance policy unambiguously capped the insured's recovery at $1,000,000.  Accordingly, we reverse the decision of the Appellate Division granting additional debris removal coverage.

I.

A.

The material facts are not in dispute.  Plaintiffs Oxford Realty Group Cedar, CLA Management, and R.K. Patten LLC (collectively, Oxford) own and manage an apartment complex located on Patten Avenue in Long Branch, New Jersey (the Property).  The Property is located in Flood Zone A according to National Flood Insurance Program classifications.  Oxford entered into an insurance contract with defendant Travelers Excess and Surplus Lines Company (Travelers) to insure the Property.  That insurance policy (the Policy) was effective between February 1, 2012, and February 1, 2013.

The Policy provided protection for the Property in the event of certain occurrences.  Four sections of the Policy are pertinent to this matter:  the Property Coverage Form; the Flood Endorsement; the Supplemental Coverage Declarations; and the General Conditions.

**Property Coverage Form**

3

The Property Coverage Form constitutes the insuring agreement and proceeds to delineate the boundaries of coverage under the Policy.  It thus establishes the structure for analyzing how the Policy's parts work together.  Section A's Insuring Agreement states that

> [Travelers] will pay for direct physical loss or damage to Covered Property at premises as described in the most recent Statement of Values . . . caused by or resulting from a Covered Cause of Loss.  Covered Cause of Loss means risks of direct physical loss unless the loss is excluded in Section D., Exclusions; limited in Section E., Limitations; or excluded or limited in the Supplemental Coverage Declarations or by endorsements.

Under Section B, Coverage explains what is and is not covered.  The section notes at the outset that

> [c]overage is provided for Covered Property and Covered Costs and Expenses . . . unless excluded in Section C., Property and Costs Not Covered.  Coverage applies only when a Limit of Insurance is shown in the Supplemental Coverage Declarations for the specific type of Covered Property or Covered Costs and Expenses, except for items B.2.a., d., e., g., h. and i.[,] which do not require a specific Limit of Insurance to be shown.

Section B.1 addresses "Covered Property" and B.2 addresses "Covered Costs and Expenses."  "Covered Property" includes "Building(s)" and "Business Personal Property," among other property items.  Under Section B.2, "Covered Costs and Expenses" include "Debris Removal," among other services and expenses.  Section B.2.a. addresses debris removal:

4

(1) [Travelers] will pay the necessary and reasonable expense incurred by [Oxford] to remove debris of Covered Property, other than "Outdoor Property[,]" caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

. . . .

(2) For this Debris Removal Coverage, [Travelers] will pay up to 25% of:

    (a)   The amount [Travelers] pays for the direct physical loss or damage to the Covered Property; plus

    (b)   The deductible in this policy applicable to that direct physical loss or damage.

This limit is part of and not in addition to the Limit of Insurance that applies to the lost or damaged Covered Property. But if:

(a)(i) The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

(ii) The debris removal expense exceeds the above 25% limitation;

and

    (b)   A Limit of Insurance is specified in the Supplemental Coverage Declarations for Debris Removal (additional);

[Travelers] will also pay an additional amount, up to the Limit of Insurance specified in the Supplemental Coverage Declarations for Debris Removal (additional)[.]

5

Section D of the Property Coverage Form lists "Exclusions" and specifically disavows any coverage for flood under the Property Coverage Form's terms.

**Flood Endorsement**

Although the Property Coverage Form excludes flood damage, the parties to this insurance contract added a Flood Endorsement to the Policy to provide for flood occurrence coverage. Section F of the Flood Endorsement sets a cap for the flood coverage. Specifically, Section F states that

> [t]he most [Travelers] will pay for the total of all loss or damage caused by Flood in any one policy year is the single highest Annual Aggregate Limit of Insurance specified for Flood shown in the Supplemental Coverage Declarations. This limit is part of, and does not increase, the Limits of Insurance that apply under this policy.
>
> Subject to the single highest Annual Aggregate Limit of Insurance:
>
> 1. Any individual Aggregate Limit of Insurance shown in the Supplemental Coverage Declarations for Flood is the most [Travelers] will pay in any one policy year for all loss or damage to which that Limit of Insurance applies.
>
> 2. If more than one Annual Aggregate Limit of Insurance applies to loss or damage under this endorsement in any one occurrence, each limit will be applied separately, but the most [Travelers] will pay under this endorsement for all loss or damage in that occurrence is the single highest Annual Aggregate Limit of Insurance applicable to that occurrence.

6

**Supplemental Coverage Declarations**

In the Policy's Supplemental Coverage Declarations section, the insurance agreement establishes that the insurance "applies on a Blanket basis" for coverage, and Section A identifies that covered property shall include "Buildings" and "Business Personal Property." Specific values are assigned under Blanket Limits of Insurance for the entire Covered Property.

Section B then delineates the Limits of Insurance for all types of various expenses and occurrences. Of particular relevance for this case are these provisions. Section B.6 provides a $250,000 limit for "Outdoor Property including Debris Removal, in any one occurrence." Section B.7 states, "Debris Removal (additional), in any one occurrence: [The Limit of Insurance is] $500,000." And, Section B.14 addresses the Limit of Insurance for Flood. According to Section B.14:

> Flood -- aggregate in any one policy year, for all losses covered under this policy, commencing with the inception date of this policy:
>
> a. Occurring at Insured Premises resulting from Flood to buildings, structures or property in the open within Flood Zone A . . . or property in or on buildings or structures located within such Flood Zones:
>
> [The Limit of Insurance is] $1,000,000.

**General Conditions**

7

In addition, in its General Conditions section, the Policy includes Section O, which addresses and explains the Limits of Insurance that apply under this contract. According to Section O:

    1. The most [Travelers] will pay for loss or damage in any one occurrence is the applicable specified Limit(s) of Insurance shown in the Supplemental Coverage Declarations, Schedules, Coverage Form(s) or endorsement(s).

    2. Under the Property Coverage Form, unless otherwise stated in the Supplemental Coverage Declarations, or by endorsement:

        a. Payments under the following Covered Costs and Expenses will not increase the applicable Covered Property Limit(s) of Insurance:

            (1) Debris Removal. But if a Limit of Insurance for Debris Removal (additional) is specified in the Supplemental Coverage Declarations, that Limit of Insurance will apply in addition to the applicable Covered Property Limit of Insurance;

    . . . .

        b. The Limits of Insurance that are specified for the remaining Covered Costs and Expenses are in addition to the Covered Property Limit(s) of Insurance.

B.

The Property suffered significant flood damage when Superstorm Sandy (Sandy) struck New Jersey in October 2012. After Sandy, Oxford undertook repair efforts, including "the

8

removal of damaged or undamaged portions of the building complex and the removal of the debris which resulted from the construction and from the damage caused by the flood." Shortly thereafter, Oxford submitted a claim to Travelers pursuant to the Policy. Oxford claimed flood damage in excess of $1,000,000. Additionally, Oxford claimed $207,961.28 in debris removal costs.

Oxford sought to recover the debris removal costs as an amount due over and above the $1,000,000 of flood coverage provided under the Flood Endorsement. Travelers, however, asserted that all damage caused by the flood was subject to the $1,000,000 limitation for a flood occurrence. Accordingly, Travelers paid Oxford only $1,000,000 on its claim.

In July 2013, Oxford sued Travelers in Superior Court. Oxford sought to hold Travelers accountable for payment of up to $500,000 for debris removal costs in addition to the $1,000,000 paid for flood damage under the Policy. In February and March 2014, both parties moved for partial summary judgment on the issue of Travelers' liability for the debris removal costs.

In April 2014, the trial court issued a written decision granting partial summary judgment in favor of Travelers. The court did not find the Policy to be ambiguous regarding flood coverage and debris removal coverage. The court acknowledged that the Supplemental Coverage Declarations appeared to allow

9

additional debris removal coverage in Section B.7, but concluded that Section B.14's Limit of Insurance for Flood nullified any coverage for flood damage above $1,000,000.

The court further held that "the general condition that the debris removal is an additional coverage must yield to the specific term in the Supplemental Coverage Declarations that the [$1,000,000] coverage applies to 'all losses' caused by flood." Accordingly, the trial court granted partial summary judgment in favor of Travelers. In August 2014, the court granted summary judgment in favor of Travelers on all remaining counts.

Thereafter, Oxford appealed the grant of summary judgment. In an unpublished per curiam opinion, the Appellate Division reversed the grant of summary judgment and remanded for entry of judgment in favor of Oxford. The Appellate Division agreed with the trial court that the flood coverage and debris removal coverage were unambiguous. However, the panel concluded that the Policy required the provision of up to $500,000 for debris removal coverage in addition to the $1,000,000 flood limit.

The panel held that the $1,000,000 limitation in Section B.14 of the Supplemental Coverage Declarations applied only to insured buildings rather than insured occurrences. In contrast, the panel held that the Property Coverage Form's additional debris removal coverage applied to all Covered Property, not just Oxford's buildings. The panel further reasoned that the

10

Flood Endorsement did not limit Oxford's damages to $1,000,000 because the endorsement applied "only to loss or damage to covered property caused by flood, meaning Oxford's building." (Emphasis added). The panel concluded that Travelers was required to pay an additional $207,961.28 for debris removal under the Policy.

We granted Travelers' petition for certification. 227 N.J. 216 (2016).

## II.

Travelers argues that the terms of the Policy unambiguously cap all flood-related coverage at $1,000,000 per flood occurrence. Specifically, Travelers highlights the Flood Endorsement's statement that "[t]he most [Travelers] will pay for the total of all loss or damage caused by Flood in any one policy year is the single highest Annual Aggregate Limit of Insurance specified for Flood shown in the Supplemental Coverage Declarations," which is $1,000,000 under Section B.14 of the Supplemental Coverage Declarations.

Travelers further contends that the words "Covered Property Limit(s) of Insurance" in Section O.2 of the Policy's General Conditions refer to the value of Oxford's buildings and business personal property, not the limitations for flood coverage. Similarly, Travelers avers that Section B.2.a. of the Property Coverage form and Section B.7 of the Supplemental Coverage

Declarations refer to the value of Oxford's buildings and business personal property. In addition, Travelers maintains that Oxford is incapable of invoking the doctrine of reasonable expectations because it is a sophisticated commercial entity, which procured the specific Policy through use of a professional broker.

In contrast, Oxford claims that the Policy unambiguously provides up to $500,000 in debris removal coverage in addition to the $1,000,000 flood limit. According to Oxford, Section B.7 of the Supplemental Coverage Declarations, Section O.2 of the General Conditions, and Section B.2.a. of the Property Coverage Form all grant an additional $500,000 in debris removal coverage. Oxford contends that the Limits of Insurance referenced in those sections are not the values of its buildings and personal property, but instead separate coverage limits such as the $1,000,000 flood limitation.

Alternatively, Oxford argues that if this Court finds the Policy to be ambiguous, we should construe the terms in its favor. Oxford avers that the Policy is so confusing that an average policyholder would be incapable of ascertaining the boundaries of coverage. Oxford further asserts that, even if this Court determines that the Policy technically disfavors coverage, the doctrine of reasonable expectations demands additional debris removal coverage. Essentially, Oxford takes

12

the position that any policyholder not involved in the insurance industry is an unsophisticated policyholder.

III.

Surplus lines insurance policies, governed by N.J.S.A. 17:22-6.40 to -6.84, offer coverage in specialized situations. Surplus lines policies insure "risks which insurance companies authorized or admitted to do business in [New Jersey] have refused to cover by reason of the nature of the risk." R.R. Roofing & Bldg. Supply Co. v. Fin. Fire & Cas. Co., 85 N.J. 384, 389 (1981). These policies are unique in that the insured parties "engage[] in high risk enterprises for which insurance could only be obtained from a surplus lines carrier" through a broker. Am. Wrecking Cor. v. Burlington Ins. Co., 400 N.J. Super. 276, 283 (App. Div. 2008). Insureds procure surplus lines policies covering commercial risk through insurance brokers, thus involving parties on both sides of the bargaining table who are sophisticated regarding matters of insurance. Ibid.; Werner Indus., Inc. v. First State Ins. Co., 112 N.J. 30, 38 (1988).

In assessing the meaning of provisions in an insurance contract, courts first look to the plain meaning of the language at issue. Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008). "If the language is clear, that is the end of the inquiry." Ibid. Thus, "in the absence of an

13

ambiguity, a court should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one purchased." Ibid. (quoting Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 272-73 (2001)); see also George J. Kenny & Frank A. Lattal, N.J. Ins. Law § 4-2:3, at 75 (2016 ed.).

In many insurance contract disputes, the parties disagree as to the plain meaning of contractual provisions, or claim that the provisions are ambiguous. The presence of an ambiguity is key because "if an ambiguity exists, the court will resort to tools and rules of construction beyond the corners of the policy." Kenny & Lattal, supra, § 4-3, at 76. But our courts will not manufacture an ambiguity where none exists. Chubb, supra, 195 N.J. at 238; Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537 (1990); see also Kenny & Lattal, supra, § 4-3:1, at 77-79.

"An 'insurance policy is not ambiguous merely because two conflicting interpretations of it are suggested by the litigants.'" Fed. Ins. Co. v. Campbell Soup Co., 381 N.J. Super. 190, 195 (App. Div. 2005) (quoting Powell v. Alemaz, Inc., 335 N.J. Super. 33, 44 (App. Div. 2000)), certif. denied, 186 N.J. 365 (2006). Nor does the separate presentation of an insurance policy's declarations sheet, definition section, and

14

exclusion section necessarily give rise to an ambiguity. Zacarias v. Allstate Ins. Co., 168 N.J. 590, 602-03 (2001).

Ordinarily, our courts construe insurance contract ambiguities in favor of the insured via the doctrine of contra proferentem. Progressive, supra, 166 N.J. at 273. In applying contra proferentem, courts "adopt the meaning that is most favorable to the non-drafting party." Pacifico v. Pacifico, 190 N.J. 258, 267 (2007) (citing 5 Corbin on Contracts § 24.27 (Perillo ed., rev. ed. 1998)). Sophisticated commercial insureds, however, do not receive the benefit of having contractual ambiguities construed against the insurer. Chubb, supra, 195 N.J. at 246; Werner Indus., supra, 112 N.J. at 38. Contra proferentem is a consumer-protective doctrine "only available in situations where the parties have unequal bargaining power. If both parties are equally 'worldly-wise' and sophisticated, contra proferentem is inappropriate." Pacifico, supra, 190 N.J. at 268.

The doctrine of reasonable expectations is a related doctrine commonly applied in cases where an ambiguity is alleged. Kenny & Lattal, supra, §§ 4-5 to 4-5:1, at 84-87; 28 Eric Mills Holmes, Appleman on Insurance § 173.10[C] (2d ed. 2008). Under that doctrine, "the insured's 'reasonable expectations' are brought to bear on misleading terms and conditions of insurance contracts and genuine ambiguities are

15

resolved against the insurer." Di Orio v. N.J. Mfrs. Ins. Co.,
79 N.J. 257, 269 (1979). Similar to the doctrine of contra
proferentem, the doctrine of reasonable expectations is less
applicable to commercial contracts. See Nunn v. Franklin Mut.
Ins. Co., 274 N.J. Super. 543, 549-51 (App. Div. 1994)
(distinguishing commercial policy from homeowners policy).

IV.

The Appellate Division held that the terms of the Policy
were unambiguous and provided Oxford with additional debris
removal coverage. We cannot agree. The terms of the Policy
unambiguously place a $1,000,000 total on recovery for all flood
occurrence losses.

To begin, we look to the explicit terms of the Flood
Endorsement and Section B.14 of the Supplemental Coverage
Declarations. It is undisputed that, absent the Flood
Endorsement, the Policy would not cover any flood damage.

Section F of the Flood Endorsement places a hard cap on the
amount recoverable for flood damage. Under that section,

> [t]he most [Travelers] will pay for the total
> of all loss or damage caused by Flood . . . is
> the single highest Annual Aggregate Limit of
> Insurance specified for Flood shown in
> [Section B.14 of] the Supplemental Coverage
> Declarations. This limit is part of, and does
> not increase, the Limits of Insurance that
> apply under this policy.
>
> [(Emphasis added).]

16

Section F.2 fortifies this hard cap by explaining that, even if multiple Annual Aggregate Limits of Insurance apply to flood damage, the Limit of Insurance specified in Section B.14 of the Supplemental Coverage Declarations is the most Travelers will pay. Section B.14 sets that Limit of Insurance at $1,000,000.

Thus, the Flood Endorsement categorically denies any flood damage coverage in excess of $1,000,000. The Flood Endorsement also clarifies that this $1,000,000 ceiling will apply even if more than one Limit of Insurance applies, such as the Limit of Insurance for debris removal in Section B.7 of the Supplemental Coverage Declarations. Therefore, the Flood Endorsement controls the extent of flood coverage and it is not modified by the rest of the Policy's terms.

The Appellate Division arrived at a different conclusion regarding the Flood Endorsement and Section B.14 of the Supplemental Coverage Declarations. In the appellate panel's reading, the $1,000,000 cap on flood coverage applied only to Oxford's buildings.

In reaching this conclusion, the appellate panel opined that Section B.14 of the Supplemental Coverage Declarations provided a $1,000,000 limit for all losses "resulting from Flood to buildings." The full text of Section B.14, however, belies this interpretation. Section B.14.a. provides $1,000,000 in flood coverage for all damage "resulting from Flood to

17

buildings, structures, or property" within Flood Zone A.  There is no indication that this limitation applies only to Oxford's buildings.  Additionally, the Appellate Division's reading disregards the Flood Endorsement's express language limiting coverage for all damage and loss caused by flood to the highest Annual Aggregate Limit of Insurance: $1,000,000.  Thus, a plain reading of the Policy's text conflicts with the Appellate Division's holding.

The Property Coverage Form and General Conditions further support our reading.  Both Section B.2.a. of the Property Coverage Form and Section O.2.a. of the General Conditions set forth circumstances in which Oxford may claim debris removal coverage in addition to Covered Property Limits of Insurance.  Covered Property Limits of Insurance are values assigned to Oxford's buildings and business personal property.  As a result, those sections provide debris removal coverage in addition to the values of Oxford's buildings and business personal property.  Those sections do not add coverage to limitations for occurrences such as flood or fire.[1]

---

[1] Oxford's reliance upon Section O.2 of the General Conditions is unconvincing, further, because that section increases coverage "unless otherwise stated . . . by endorsement."  Thus, even if Section O.2 applied to the flood limit, the terms of the Flood Endorsement would negate any increase in coverage.

18

Therefore, we do not find the Policy's provision of flood coverage and debris removal coverage to be ambiguous. Oxford's alternative reading presents a conflicting interpretation suggested by litigants rather than a genuine ambiguity. Fed. Ins. Co., supra, 381 N.J. Super. at 195. The Policy limits Oxford's flood coverage to $1,000,000 and therefore will be enforced as written. Longobardi, supra, 121 N.J. at 537.

We also find support for our opinion in the decisions of other jurisdictions. See Chubb, supra, 195 N.J. at 238 ("[C]ourts frequently look to how other courts have interpreted the same or similar language in standardized contracts to determine what the parties intended, especially where rules in aid of interpretation fail to offer a clear result.")

The Eighth Circuit addressed a similar issue in Altru Health System v. American Protection Insurance Co., 238 F.3d 961 (8th Cir. 2001). The insured plaintiff and insurer defendant contracted to cover a commercial hospital. Id. at 962-63. One section of the contract provided coverage for losses incurred during "Interruption by Civil Authority." Id. at 963. The parties subsequently added flood coverage to the contract, capping the insurer's liability "for losses resulting from any one Flood disaster" at $1,500,000. Id. at 962-63. A severe flood damaged the hospital and caused a civil authority to close the hospital temporarily. Id. at 962. The insured claimed that

19

losses sustained from the civil authority's closure of the hospital applied in addition to the $1,500,000 flood limit. Ibid.

The court disagreed and concluded that the Civil Authority coverage limit did not apply in addition to the $1,500,000 flood limit. Id. at 963-65. The court reasoned that the Civil Authority coverage was not "a self-contained policy provision" to which the flood limit did not apply. Ibid. Rather, the court held that the $1,500,000 flood limit applied to all damages caused by an occurrence of flood, even if the contract assigned individual sublimits to specific types of damages. Ibid.

Thus, Altru Health supports our conclusion that the $500,000 debris removal limit does not apply in addition to the Flood Endorsement's $1,000,000 limit. Although the Policy assigns debris removal a coverage sublimit, it does not constitute a self-contained policy provision outside the application of the $1,000,000 flood limit. See also El-Ad 250 W. LLC v. Zurich Am. Ins. Co., 988 N.Y.S.2d 462 (N.Y. Sup. Ct. 2014) (declining to apply additional coverage from other sublimits of an insurance policy in addition to a flood limit when a single occurrence of flood caused various damages), aff'd, 13 N.Y.S.3d 68 (N.Y. App. Div. 2015).

20

Because we do not find the terms of the Policy ambiguous, we need not address Oxford's contentions about contra proferentem or the doctrine of reasonable expectations. See Pacifico, supra, 190 N.J. at 267-68 (characterizing contra proferentem as doctrine of last resort applied to ambiguities); Di Orio, supra, 79 N.J. at 269-70 (declining to apply doctrine of reasonable expectations absent ambiguous or misleading terms).

V.

The judgment of the Appellate Division is reversed, and the trial court's grant of summary judgment in favor of Travelers is reinstated.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE ALBIN filed a separate, dissenting opinion in which JUSTICE TIMPONE joins.

OXFORD REALTY GROUP CEDAR,
CLA MANAGEMENT, and R.K.
PATTEN, LLC,

    Plaintiffs-Respondents,

        v.

TRAVELERS EXCESS AND SURPLUS
LINES COMPANY,

    Defendant-Appellant.

    JUSTICE ALBIN dissenting.

    The majority finds that the language of the insurance policy at issue unambiguously limits the insured's damages to $1,000,000 in flood coverage.  The Appellate Division found that the policy's language unambiguously provides, in addition to the flood-insurance coverage, $500,000 for debris removal costs.  Both cannot be right, and neither is wholly wrong.  Both sides have reasonable arguments because the insurance contract is hopelessly ambiguous and needlessly complex.  Deciphering an insurance contract should not be comparable to breaking the Enigma code.

    Because reasonable minds can differ about the meaning and interplay of the flood insurance and debris removal clauses in the insurance policy and because Travelers drafted the ambiguous

policy terms, I believe that the insured's interpretation should prevail under the doctrines of contra proferentem and reasonable expectations. I therefore respectfully dissent.

I.

Oxford purchased an insurance policy that provides coverage for damages caused by flood. Oxford also purchased additional coverage for debris removal. The question is whether this insurance policy provides reimbursement for the cost of debris removal above the limit for damages caused by flood. I disagree with the majority that there is only one ineluctable answer. One reasonable interpretation that can be teased from the ninety-one-page insurance policy is that Oxford is entitled to reimbursement for debris removal after exceeding the limit for damages caused by flood.

Here is the policy language that leads to that conclusion.

A.

The section entitled "Supplemental Coverage Declarations" sets the "Limits of Insurance" for certain losses. Paragraph 14 states that the aggregate limit "for all losses covered under this policy" for "Flood" is $1,000,000. Paragraph 7, however, states that the limit for "Debris Removal (additional), in any one occurrence," is $500,000. According to the policy terms, reimbursement for debris removal is "additional," which in common parlance means "added, extra, or supplementary to what is

2

already present or available." The New Oxford American Dictionary 18 (2d ed. 2005). That language suggests that flood loss is covered up to a limit of $1,000,000 but that reimbursement for debris removal in the amount of $500,000 is "additional" to any loss exceeding the flood limit.

This interpretation is strengthened by the instruction that "[f]or application of Limits of Insurance refer to Section O," which is located in the General Conditions section of the policy. The preamble to the General Conditions section states that "[a]ll coverages included in this policy are subject to the following conditions," one of which is Section O. Section O.2.a.(1) provides that "if a Limit of Insurance for Debris Removal (additional) is specified in the Supplemental Coverage Declarations, [it] will apply in addition to the applicable Covered Property Limit of Insurance." (Emphasis added).

Oxford's interpretation is further bolstered by Section B.2.a.(1) and (2) of the Property Coverage Form that addresses debris removal. Section B.2.a.(1) generally provides that Travelers "will pay the necessary and reasonable expense incurred by the Insured to remove debris of Covered Property . . . caused by or resulting from a Covered Cause of Loss that occurs during the policy period." Section B.2.a.(2) specifically provides that if:

> (a)(i) The sum of direct physical loss or

3

damage and debris removal expense exceeds the Limit of Insurance; or

(ii) The debris removal expense exceeds the above 25% limitation; and

(b) A Limit of Insurance is specified in the Supplemental Coverage Declarations for Debris Removal (additional); [then]

[Travelers] will also pay an additional amount, up to the Limit of Insurance specified in the Supplemental Coverage Declarations for Debris Removal (additional).

[(Emphasis added).]

Oxford's claim appears to meet the preconditions for additional debris removal coverage. Oxford's total claimed loss of $1,207,961.28 exceeds the $1,000,000 flood-insurance limit, and the Supplemental Coverage Declarations explicitly provides for up to $500,000 of additional debris removal as a separate limit. Therefore, a reasonable interpretation of the insurance policy allows for $500,000 of debris removal as an additional coverage above the $1,000,000 limit of insurance applying to a flood loss.

B.

The majority takes the position that the Flood Endorsement stands apart from the remainder of the contract and controls the extent of flood coverage available to Oxford. Ante at ___ (slip op. at 17). That approach leads the majority to conclude that the Flood Endorsement separately controls the limit of coverage

4

for any damage stemming from a flood. Id. at ___ (slip op. at 16-17).

But the Flood Endorsement is not an island unto itself; it is inextricably interwoven into an insurance policy that must be read as a whole. See Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) ("Contracts should be read 'as a whole in a fair and common sense manner.'" (quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009))). The Flood Endorsement must be viewed in conjunction with the Property Coverage Form, the Supplemental Coverage Declarations, and the General Conditions of the policy. Doing so would lead a reasonable insured to believe that debris removal coverage is additional to flood coverage.

At the very least, "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247 (1979). In construing an insurance contract, if the "language of a policy will support two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 416 (2016) (quoting Butler v. Bonner & Barnewell, Inc., 56 N.J. 567, 575 (1970)).

Given the uncertain scope of coverage, Oxford should receive the benefit of having the contractual ambiguity

5

construed against the insurer under the doctrines of <u>contra proferentem</u> and reasonable expectations.

## II.

An insurance policy is not an ordinary contract, but rather a "contract[] of adhesion between parties who are not equally situated." <u>Nav-Its, Inc. v. Selective Ins. Co. of Am.</u>, 183 <u>N.J.</u> 110, 118 (2005) (alteration in original) (quoting <u>Doto v. Russo</u>, 140 <u>N.J.</u> 544, 555 (1995)). Under the doctrine of <u>contra proferentem</u>, "a court generally will adopt the meaning that is most favorable to the non-drafting party," or, stated differently, an interpretation against the draftsman. <u>Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.</u>, 195 <u>N.J.</u> 231, 238 (2008). The doctrine of <u>contra proferentem</u> applies to a commercial entity that did not "participate[] in the drafting of the insurance contract." <u>See</u> <u>Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.</u>, 179 <u>N.J.</u> 87, 102 (2004). "[O]nly where it is clear that an insurance policy was 'actually negotiated or jointly drafted,' and where the policyholder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked." <u>Owens-Illinois, Inc. v. United Ins. Co.</u>, 264 <u>N.J. Super.</u> 460, 488 (App. Div. 1993) (quoting <u>AIU Ins. Co. v. FMC Corp.</u>, 799 <u>P.</u>2d 1253, 1265 (Cal. 1990)), <u>rev'd in part and remanded on other grounds</u>, 138 <u>N.J.</u> 437 (1994).

6

Although Oxford is a commercial entity, there is no evidence to suggest that it negotiated the terms of this insurance contract with Travelers. The insurance policy is an amalgamation of standardized forms and boilerplate language spread over nearly one-hundred pages of dense and confusing verbiage. Under our jurisprudence, any ambiguity about the scope of coverage should be resolved in favor of Oxford.

III.

The doctrine of reasonable expectations is another interpretive canon for construing ambiguous insurance contracts. In a case involving a sophisticated insured, a governmental entity, this Court stated that ambiguous terms should be resolved "against the insurer and in favor of the insured to give effect to the insured's reasonable expectations." Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 601, 608 (2011); see also Stone-E-Brick, supra, 81 N.J. at 247 (stating that reasonable expectations of insured commercial entity prevail if legitimate ambiguity arises from phrasing of insurance policy).

The majority's strained and hyper-technical analysis is at variance with the interpretive canons that favor the insured when a policy is so riddled with ambiguity that no clear understanding can be reached about the scope of an insurance contract. One sensible interpretation of the policy is that the

7

"additional" debris removal coverage was intended to supplement the reimbursement available for flood. That interpretation justifies Oxford's reasonable expectations.

IV.

Because the majority finds certitude where ambiguity abounds and because Oxford is denied the benefit of its reasonable interpretation of an insurance policy that entitles it to debris removal coverage, I respectfully dissent.